UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

UNITED STATES OF AMERICA        )
                                )
        v.                      )   No. 5:25-mj-00947-RBF-1
                                )
JAIME ALBERT QUINTANILLA-CHAVEZ, )   San Antonio, Texas
                                )   June 26, 2025
        Defendant.              )
_____ )

TRANSCRIPT OF PRELIMINARY AND DETENTION HEARING
BEFORE THE HONORABLE ELIZABETH S. CHESTNEY
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S:

FOR THE GOVERNMENT:
Sarah Wannarka
U.S. Attorney's Office
601 NW Loop 410, Suite 600
San Antonio, TX 78216

FOR THE DEFENDANT:
Marina Thais Douenat
Federal Public Defender's Office
300 Convent Street, Suite 2300
San Antonio, TX 78205

COURT RECORDER:  FTR Gold

Proceedings reported by electronic sound recording.  Transcript produced by computer-aided transcription.

INDEX

PAGE

STEVEN FUENTES

Direct Examination by Ms. Wannarka ........................3

Cross-Examination by Ms. Douenat .........................10

DAVID DAVILA

Direct Examination by Ms. Douenat ........................31

TATIANA ACEVEDO-HERRERA

Direct Examination by Ms. Douenat ........................44

ROSALINDA MUNGUIA

Direct Examination by Ms. Douenat ........................48

CLAUDIA GALAN

Direct Examination by Ms. Douenat ........................53

*(10:06 a.m.)*

THE COURT:  You may be seated.

THE CLERK:  United States of America v. Jaime Albert Quintanilla-Chavez, SA:25-MJ-947.

THE COURT:  Good morning.  Appearances.

MS. WANNARKA:  Good morning.  Sarah Wannarka for the United States.

MS. DOUENAT:  Good morning, Your Honor.  Marina Douenat on behalf of Mr. Quintanilla-Chavez.

THE COURT:  All right.  We're here today on the preliminary and detention hearing.  Are we proceeding on both, Ms. Douenat?

MS. DOUENAT:  Yes, Your Honor, we are.

THE COURT:  Okay.  I'll let you proceed then, Ms. Wannarka.

MS. WANNARKA:  The government calls Steve Fuentes to the stand.

THE CLERK:  If you can pause for me right there, please.  Please raise your right hand.

*(The oath was administered)*

THE CLERK:  Thank you.

STEVEN FUENTES, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. WANNARKA:

Q.  Please tell the Court your name.

A.   Steven Fuentes.

Q.   Will you move forward and speak into the microphone?

A.   Yeah.   Steven Fuentes.

Q.   Thank you.   And how are you employed?

A.   I am a special agent with Homeland Security Investigations.

Q.   Are you the case agent in this assault federal officer case against Jaime Albert Quintanilla-Chavez?

A.   I am.

Q.   Okay.   So how -- let's start with what happened in this incident.   Let's go back to June 20th, 2025.   What was happening?

A.   On June 20th, 2025, agents and officers from Homeland Security Investigations Enforcement and Removal Operations and Texas Department of Public Safety were conducting an operation to identify Mr. Quintanilla.   They were doing surveillance at the residence they believed he was staying at.   They observed what appeared to -- who fit the description of Mr. Quintanilla to come out of the residence, get into a white Dodge Ram and leave the residence.

Q.   Now, let me ask you, there at that point, had they received information that Mr. Quintanilla was at that residence and did not have status to be in the United States?

A.   Yes.

Q.   And then did they believe he had a final order of removal?

A.   Yes.

Q.  Okay.  All right.  So they identified Quintanilla as he comes out of the residence, and that matches the intelligence that they had received?

A.  Yes.

Q.  Okay.  So then what happened next?

A.  Once Mr. Quintanilla left the residence, agents proceeded to follow his vehicle.

Q.  And what was he driving?

A.  He was driving a white Dodge Ram with a trailer behind it.

Q.  Like a work -- like a --

A.  A work trailer with construction equipment.

Q.  Okay.  All right.  Go ahead.

A.  At some point during -- while he was leaving the residence, agents decided to conduct a probable cause stop on the vehicle. They activated their emergency lights and sirens.

Q.  So this was as he was driving away.  He left the residence and was driving away?

A.  Yes.

Q.  Okay.  And they initiated a probable cause stop?

A.  Yes.  And this was on Culebra Road.  Once lights and sirens were initiated, Mr. Quintanilla took a right turn on a side street, and he stopped the vehicle on the right side of the road.

Q.  Okay.  So then which agent is right behind the defendant?

A.  Special Agent Will Carl --

Q.  Okay.

A.  -- was right behind, following Mr. Quintanilla in a blue Camaro.

Q.  And Agent Carl, he is the victim in this case?

A.  Yes.

Q.  Okay.  So he's first, and then ERO in their vehicle is second?

A.  That's my understanding.  Yes.

Q.  Okay.  So what happens next?

A.  They got out of the vehicle.  Officer Hernandez from Enforcement Removal Operations approached the vehicle and gave Mr. Quintanilla commands.

Q.  He approached the driver's side?

A.  The driver's side of the vehicle, yes.

Q.  Okay.

A.  Special Agent Carl was on the passenger side of the vehicle.

Q.  Was anyone else in the car?

A.  There was no one else, that was told to me, that was in the car, no other individuals.

Q.  All right.

A.  After numerous commands, it appeared that Mr. Quintanilla was ignoring the commands of the officers.

Q.  Commands such as?

A.  Such as, roll down the window, you know, things like that.

Steven Fuentes - Direct

And he just refused to open a window and talk to agents at the time.

Then, at the time, Mr. -- or Officer Hernandez asked if Special Agent Carl had a window breaker.

Q. Now, let's -- before we get to the window breaker, what was happening? What was the defendant doing as he was sitting in the vehicle?

A. So my understanding was he was in the vehicle, sending messages -- or he was on his phone, doing something on his phone and just totally ignoring the agents.

Q. Okay. And why was that alarming?

A. Well, just, we don't know who he was trying to contact. He was near his home. At that time agents were open and exposed. There was a lot of traffic in the area. So from an officer safety perspective, it's not something that we -- we don't want people contacting other individuals at the time. We don't know if they're trying to call somebody to come help him out or anything like that. We just don't know what goes on in that situation.

Q. So because of the officer safety concern, their goal was what?

A. To at least remove him from the vehicle and stop whatever actions that he might be doing that might potentially be harmful to an officer.

Q. Okay. So then back to what you were saying, did Agent Carl

Steven Fuentes - Direct

have a glass-breaching device?

A.   He did have a glass-breaching device.

Q.   Okay.  So then what does he do with that?

A.   So Agent Carl proceeds to the driver's side of the vehicle. Agent Carl also gives commands to roll down the window.  He also checks the door to see if it would open.  The door would not open.  It was locked.  And despite all that, that's when Agent Carl used the punch to break the glass.

Q.   Okay.  Did the glass break?

A.   It did shatter.

Q.   Okay.  So what happens next?

A.   At that point Mr. Quintanilla drove off, fled driving forward, while Agent Carl was there.  And in that, the glass shards from the window had cut up Mr. Carl -- or Agent Carl's right arm.

Q.   Okay.  So the defendant's fleeing in his vehicle?

A.   Yes.

Q.   What happens next?

A.   The Texas DPS special agents that were in front of him block his -- block him from proceeding, and then he stops. Agent Carl comes in behind, about one car length.

Q.   He moves his car up?

A.   He moves the car up, just to try to keep him from fleeing and causing more danger to the community by driving such a big vehicle through the area where there's children and other

Steven Fuentes - Direct

innocent bystanders.

Q.  Okay.  So then Agent Carl moves his car up.  What happens next?

A.  From there, Mr. Quintanilla tries to flee the scene again. He reverses into Agent Carl's vehicle, smashing the -- smashing the front bumper of his car.  And then at that point --

Q.  Where was -- where was Agent Carl at this time?

A.  He was near the vehicle.  So he had to move away from the vehicle immediately to avoid getting hit or hurt by the vehicle -- either vehicle, his vehicle or the other vehicle.

Q.  Okay. All right.  And so then is the defendant able to get anywhere then in the vehicle, or is he apprehended?

A.  At that point he was still in the vehicle, but he was -- he was blocked in.  He couldn't move anywhere.

Q.  Okay.

A.  Agent Carl goes up to the vehicle -- to the Dodge Ram.  The glass was still in place even though it was shattered.  He pulls the glass out, and he attempts to unlock the door from the inside.

Q.  Okay.  And then is this when DPS arrives as well?

A.  DPS arrives also on scene.  They're on scene at that point. Agent Carl backs away, and then at that point Officer Hernandez and the DPS agents attempt to open the door and attempt to pull him out of the vehicle.

Q.  Does the defendant become compliant at this point?

A.  He is not compliant at the time.  He's remaining in the vehicle.  Officer Hernandez actually has to get up and into the vehicle and start trying to yank him out of the vehicle.

Q.  Okay.  And then what is happening -- once he's out of the vehicle, is he still resisting and fighting the officers?

A.  From what the officers told me, he was still resisting.  He would not comply at that time.

Q.  Okay.  Does DPS eventually gain compliance?

A.  They do.

Q.  Okay.  Back to the injuries on Agent Carl's arms, was his skin cut?

A.  His skin was cut.

Q.  And did he seek medical treatment for it?

A.  He did go receive medical treatment, yes.

        MS. WANNARKA:  Okay.  All right.  I'll pass the witness.

        THE COURT:  All right.

                    CROSS-EXAMINATION

BY MS. DOUENAT:

Q.  Good morning --

A.  Good morning.

Q.  -- Agent Fuentes.  How are you?

A.  Great.  How are you?

Q.  So as you mentioned, you were part of the surveillance team on June 20th?

Steven Fuentes - Cross

A.  I was not.

Q.  Okay.  So you weren't even there?

A.  I was not there.

Q.  Okay.  You mentioned what happened that day, and you also put that in your affidavit.  So you gathered that from what?

A.  I gathered that from Agent Carl and the other officers by what they told me.

Q.  So this is what they told you.  They don't have reports yet?

A.  They're in the works, but correct.

Q.  Okay.  So this is just word of mouth?

A.  Yes.

Q.  Okay.  So this, on June 20th, it was a multiagency operation; is that correct?

A.  Yes.

Q.  And it included DHS?

A.  DHS, yes.

Q.  ICE, which is DHS, I presume?

A.  Yes.

Q.  And then ERO, which is a separate agency?

A.  It's a subcomponent of ICE.

Q.  Okay.  And then --

THE COURT:  Sorry.  What was -- it's a -- what did you say it was?

THE WITNESS:  I'm sorry, ma'am?

THE COURT:  You said what --

MS. DOUENAT:  ERO is a subcomponent of ICE.  I'm so sorry, Your Honor.

THE COURT:  Subcomponent.  Yeah.  It's okay.

MS. DOUENAT:  I will slow down.

THE COURT:  Both of you, just for the -- I know the interpreter is --

MS. DOUENAT:  Interpreter, at least.  Yes, absolutely.

BY MS. DOUENAT:

Q.  And you mentioned Texas DPS as well?

A.  Yes.

Q.  So there was at least four agencies involved?

A.  I don't know if there's four.  I would say at least three, that I know of.

Q.  And multiple agents?

A.  Yes.

Q.  And some of them had marked vehicles?

A.  There were not marked vehicles at the time.

Q.  Okay.  So most of them had unmarked vehicles?

A.  Correct.

Q.  And they also were unmarked then?

A.  The vehicles?

Q.  They.  The agents.

A.  No.  The agents were wearing vests that had clear police markings representing their agencies and whatnot.

Steven Fuentes - Cross

Q.   But you weren't there?

A.   I was not there during the actual incident.

Q.   Okay.  And the vehicles were not marked?

A.   The vehicles were not marked.  Correct.

Q.   So they were surveilling at a residential location; is that correct?

A.   Yes.

Q.   And it was before 7:00?

A.   I believe they were out there before 7:00, but you would have to ask the agents exactly what time they started surveillance.

Q.   And you spoke to them, and they mentioned that they had information that potentially there was a person there that had a removal order; is that correct?

A.   Yes.

Q.   And the whole point of being there was to try to identify if that's the person that had the removal order?

A.   Correct.

Q.   And that person had no criminal history?

A.   I don't know the full history of the defendant.

Q.   Well, the Court can take judicial notice of the PSR, pretrial report, on the fact that he has no criminal history.

    The agents who were surveilling would have known whether he had criminal history or not; is that correct?

A.   I can't speak to what the agents knew.

Steven Fuentes - Cross

Q.  Before they set up surveillance, it's smart for an agent to know the person they're surveilling, whether that person has criminal history or not; is that correct?

A.  It's important to know the background of who you're working -- or who you're trying to identify, yes.

Q.  And usually, when there's multi-agents, they usually have a briefing before they go set up surveillance; is that right?

A.  Maybe.

Q.  Where at least everybody is noticed on what they're doing?

A.  Yes.

Q.  And were you aware also that when they saw Mr. Quintanilla-Chavez get in the vehicle, he went into the vehicle with a dog?

A.  I don't -- I didn't get the information that he went into the vehicle with a dog.

Q.  You know there was a dog on site, at the scene?

A.  I had found out, yes, after the fact, that there was a dog on site.

Q.  Okay.  So they saw Mr. Quintanilla-Chavez enter his work truck that was hitched to a trailer?

A.  Correct.

Q.  And the trailer had construction equipment on it; is that correct?

A.  Correct.

Q.  Okay.  And you weren't there, so you don't know what kind

of truck it was?

A.   I saw the truck at the scene -- or I saw the pictures from the -- from the scene.  I didn't see the actual truck itself.

Q.   Okay.  But you saw pictures of the truck?

A.   Correct.

Q.   And the trailer?

A.   Yes.

Q.   Let me show you what's been marked as at least -- Defense Exhibit 1.

     And I'm tendering a copy to the government, Your Honor.

     Do you recognize this picture?

A.   I don't recognize this picture.

Q.   Okay.  Thank you.

     So you mentioned that this was near Culebra; is that correct?

A.   Yes.

Q.   And Culebra is a very busy street?

A.   It can be.

Q.   Especially in the morning, when it's ready for people to go to work?

A.   I don't know what the traffic patterns were that day.

Q.   There's neighborhoods that are next to Culebra; is that right?

A.   Yes.

Q.   And the house that they were surveilling was on Benrus; is

Steven Fuentes - Cross

that right?

A.   That's my understanding.  Yes.

Q.   And he was -- Mr. Quintanilla-Chavez was pulled over less than a mile -- actually, half a mile from Benrus; is that correct?

A.   I don't know the distance.

Q.   He was pulled over shortly after leaving his house; is that right?

A.   That's my understanding.  Yes.

Q.   Now, you weren't there, so you didn't make the traffic stop; is that right?

A.   I did not make the stop.  Correct.

Q.   And you mentioned that DPS was there?

A.   They were.

Q.   And they are traffic cops; is that right?

A.   This unit, I don't know what they specialized in.  But DPS generally has the authority to do that.  Yes.

Q.   And they're state agents; is that right?

A.   They are state agents.  Yes.

Q.   Okay.  Now, the stop was made shortly after he left the house, due to expired license plates; is that right?

A.   I don't know if the stop was made due to expired license plates.  I just know the vehicle had expired license plates, from what I was told.

Q.   And that was in your affidavit?

A.   Yes.

Q.   That he had expired license plate and the stop occurred?

A.   He had expired license plate and the stop occurred.  Yes.

Q.   Right.  The license plate expiration is a state infraction; is that right?

A.   I can't speak to the exact violation of what expired plates bring.

Q.   They're Texas plates; is that correct?

A.   That's what I recall.

Q.   So they would be a infraction of state law in Texas if they're not up to date?

A.   They're a violation of some type of law in Texas.  I don't know what level.

Q.   Right.  So it's a state infraction?

A.   Okay.

Q.   And HSI and ICE don't have enforcement -- traffic authority enforcement in Texas; is that correct?

A.   We do not stop for traffic purposes.

Q.   In fact, this was for an immigration enforcement?

A.   That's correct.

Q.   And this was based on the fact that the person was here and had a removal order?

A.   This was based on the fact that, what I was told, the person had a removal order.

Q.   Right.  And so the plan was to already detain

Mr. Quintanilla-Chavez before he left the house; is that correct?

A.   Correct.

Q.   The agents in the Camaro, there were two of them, you mentioned?

A.   I don't know how many were in the Camaro.  I believe it was just Will Carl.  But I can't -- you would have to ask Agent Carl if there was anybody else with him.

Q.   So you mentioned Agent Hernandez was in one section, and then there was somebody in the passenger side.  And that was Agent Carl --

A.   No.

Q.   -- earlier in your testimony?

A.   No.  I believe there was -- I believe Officer Hernandez was behind Agent Carl, in his own vehicle.

Q.   Okay.

        THE COURT:  I think he -- I think he testified Hernandez approached the driver's side --

        MS. DOUENAT:  Got it.

        THE COURT:  -- and that Carl approached the passenger side.

        MS. DOUENAT:  Perfect.  Thank you.

        THE WITNESS:  Yes.

BY MS. DOUENAT:

Q.   So there were two vehicles that stopped.  So shortly after

Mr. Quintanilla-Chavez gets pulled over, he actually parks on a neighborhood street, on Consuelo; is that correct?

A.   Yes.

Q.   And he pulls away from the busy Culebra roads and pulls into a neighborhood street and stops?

A.   Yes.

Q.   And there are two vehicles behind him?

A.   Yes.

Q.   And there are other vehicles that are part of this multitask operation that are also around the area; is that correct?

A.   That's correct.

Q.   DPS is in front?

A.   Somewhere in front.

Q.   Right.

A.   Correct.

Q.   But somewhere in front of Mr. Quintanilla-Chavez there is a DPS trooper; is that right?

A.   Yes.

Q.   And DPS troopers have dash cams?

A.   I don't know.

Q.   Usually their vehicles are -- he was -- the DPS trooper was in a vehicle that was DPS, right?  He was --

A.   My understanding is it was owned by DPS.  Yes.

Q.   Right.  He was uniformed?

A.   I don't know if it was a uniformed -- I don't know if he was wearing a uniform or not, but they were in unmarked vehicles.

Q.   But the Homeland Security were in unmarked vehicles.  You don't know whether DPS was uniformed or not?

A.   They were not a uniform division.  They were special agents from the Criminal Investigation Divisions.

Q.   You're talking about DPS?

A.   Yes.

Q.   Okay.  So you're saying there's no bodycam or dash cam footage?

A.   I can't speak to what they specifically have.  Now, DPS should have -- they do have bodycams, and we should have that information coming soon.

Q.   So, therefore, he was at least wearing a bodycam, if not a uniform?

A.   Yeah.  He should be wearing a bodycam -- or he was wearing a bodycam, from my understanding.

Q.   Okay.  So the first officer to make contact was, you said, Agent Hernandez?

A.   That's my understanding.  Yes.

Q.   Okay.  But you weren't there?

A.   I was not there.  Correct.

Q.   Right.  But that's what you were told?

A.   Yes.

Q.   And you did not witness the moment he was pulled over?

A.   No.

Q.   You did not hear what was said to him during the initial stop?

A.   No.

Q.   You do not know what language was used to ask him questions?

A.   I didn't hear it directly.

Q.   You don't know if he had knowledge -- if he acknowledged or responded, right?  You weren't there --

A.   I was told that he did not respond.

Q.   Right.  You don't know?

A.   I don't know -- personally, I didn't see it.

Q.   Correct.

A.   Correct.

Q.   And you don't know whether he was confused or afraid?  You personally do not know that?

A.   You know, I can't speak to Mr. Quintanilla's state of mind at the time.

Q.   Right.  And you don't know whether the window was down or partially down; is that correct?

A.   I don't recall.  I don't know specifically if it was at the time, no.

Q.   You arrived after the window was broken and after he was under arrest?

Steven Fuentes - Cross

A.   Yes.

Q.   Okay.  So you don't know at the time whether his window was partially down or not?

A.   I can't testify what exactly -- what happened during that specific time.

Q.   And you don't know whether he showed his Honduran license or not?

A.   I do not know.

Q.   You also cannot say from your knowledge that he understood that these were law enforcement officers?

A.   I can't speak to what Mr. Quintanilla was thinking at the time.

Q.   But despite not seeing any of this, you claim in your affidavit that Mr. Quintanilla-Chavez didn't respond to questions, right?

A.   He did not, from my understanding.

Q.   And that -- but this is despite the fact that he did pull over?

A.   Yes.

Q.   He was uncooperative despite the fact that he pulled over, right?  He did stop his truck?

A.   He stopped his truck, yes.

Q.   Right.  He didn't flee?

A.   Not initially.

Q.   There was no acceleration when people pulled behind him and

Steven Fuentes - Cross

got out of their cars; is that correct?

A.  That's my understanding.

Q.  That kind of suggests cooperation, doesn't it?

A.  To that point.  At that point, yes.

Q.  So let's talk about -- nobody saw him have a weapon?

A.  No one mentioned anything about any weapons.

Q.  Right.  All they saw was him on his cell phone, is that correct, at some point?

A.  They saw -- they believed he was on his cell phone. Correct.

Q.  Nobody saw a knife?

A.  They didn't -- no one said anything what they -- I can't testify to what the agents thought they saw or did not see at the time.

Q.  Let's talk a little bit about the sequence.

A.  Okay.

Q.  So you mentioned that the doors were locked.  The agents tried to open the door, and it was locked; is that right?

A.  Correct.

Q.  And then that one of the agents asked the other one if he had a mechanism to punch the window or break the window; is that right?

A.  Correct.

Q.  And so one of the agents did have that, went and got it from his car and then breached the window; is that right?

Steven Fuentes - Cross

A.  I don't know where he got the tool from, but he had the tool.

Q.  Fair enough.  But he had the tool, and he ended up breaking the window?

A.  Correct.

Q.  But you mentioned -- and that's when you mentioned that the window was broken, right?

A.  That's what I was told.  Yes.

Q.  And that's when he was cut initially?

A.  He was cut as the vehicle fled.

Q.  Let's talk about that.  So we have two vehicles behind him, and we have vehicles in the front.  And you showed up at the scene, is that right, at some point?

A.  I did eventually show up at the scene.

Q.  Okay.  Let me show what's been marked as Defense Exhibit 2.

    Just tendered 1 to government counsel, Your Honor.

    Does this look familiar?

A.  I don't know -- I haven't seen this photo.

Q.  You haven't seen it, but does this look familiar?  When you arrived at the scene, does this look -- the scene you arrived to?

A.  I didn't arrive to the scene.

Q.  Okay.  So your vehicle was not in this scene?

A.  My vehicle is not in the scene.

Q.  All right.  It's fair to say that the street that this car

was on is a residential street?

A.   Yes.

Q.   It's smaller than the one -- than Culebra?

A.   Yes.

Q.   And that the agents had trucks, as well as a Camaro; is that correct?

A.   According to this photo, I mean, that's what they were driving.

Q.   I mean, you mentioned they were unmarked vehicles.  You know whether their fleet is trucks or not.

A.   Well, I mean -- I mean, it looks like there's a truck and an SUV in this photo.  Yes.

Q.   Okay.  And there's also a Camaro, since that's what you were told?

A.   I know -- well, I know Will Carl drives a Camaro.

Q.   Okay.  So you don't know whether -- when Mr. Quintanilla-Chavez parked, you don't know whether he had put it in park or whether his foot was just on the brake; is that correct?

A.   That's correct.  I don't know.

Q.   And so what happened was, the window was breached.  Glass just fell in; is that correct?

A.   I don't know if the glass fell in or not.

Q.   Okay.  Bottom line is, somebody got cut.  So --

A.   Yes.

Steven Fuentes - Cross

Q.   So glass fell somewhere?

A.   There was glass -- broken glass somewhere.  Yes.

Q.   Right.  So if you're in the driver's side and somebody is breaking your window, that can stun you; is that correct?

A.   I'm trying to understand.  If I'm in the driver's side --

Q.   So if somebody breaks the glass, and shards of glass come inside the car, would you want to stay away from them?  You don't want to get cut.  Is that fair to say?

A.   I would want to get away -- I would want to move away.  Yes.

Q.   Right.  So you would want to move away.  And potentially your foot could slide off the brake; is that right?

A.   Is it possible?  Yes.  Anything's possible.

Q.   And then at some point shortly thereafter, like, pretty quickly, DPS came in front of the vehicle; is that right?

A.   Yes.

Q.   And blocked the truck?

A.   Yes.

Q.   And the truck was already blocked from behind?

A.   Yes.

Q.   And then at some point he had nowhere to go; is that right?

A.   From my understanding, he attempted to go in reverse, and that's when he rammed Mr. Carl's car.

Q.   And that's your understanding?

A.   Yes.  And the photos show that he -- or the photos show the

two vehicles up against each other.

Q.   And you have those photos?

A.   Yes.

Q.   But you don't know whether that vehicle came close to that when they parked; is that correct?

A.   I can't -- that's the agent's testimony at the time.

Q.   Right.  And then after that is when an agent reached out and opened the door; is that right?  You mentioned that the agent then went in, pulled the glass.

A.   So after Agent Carl --

Q.   The vehicle was stopped.

A.   -- tried to move away from the vehicle that was coming toward him, Mr. Quintanilla's vehicle, for his own safety, he then approached the vehicle and tried to open the door from the inside, unlock the door from the inside.

Q.   But before that, he said the glass was still there, so then he pulled the glass out; is that right?

A.   That's my understanding.

Q.   Right.  So the glass was still there, but he got cut beforehand, before the car went into --

A.   Well, the glass was already shattered, but it was -- I believe it was still in place.  Some of it was still in place at the time.

Q.   Okay.  And then that's when he opened the door and pulled him out; is that right?

Steven Fuentes - Cross

A.   That's when he opened the door.  I believe that's when --
Officer Hernandez is the one that first went in to pull him
out.  And then he was assisted with -- by Texas DPS.

Q.   All right.  So there was several people who pulled him out
and put him on the floor?

A.   My understanding is it ultimately resulted -- multiple
agents to gain control of Mr. Quintanilla.

Q.   But at no time did Mr. Quintanilla-Chavez ever threaten any
of the officers verbally?

A.   I don't know if he did or did not.

Q.   He never attacked them with any weapons; is that correct?

A.   I don't know if he used any kind of weapon or not.

Q.   And you say he resisted, but he never threw punches; is
that right?

A.   Well, resisting can also be not listening to commands or
not going with an officer trying to pull you out of a vehicle.
That's resistance.

Q.   Then, again, you don't know what language they used in
communicating with him; is that right?

A.   I believe they used both English and Spanish.  I can't
confirm that.

Q.   You don't know that, though?

A.   I don't know for sure.

Q.   Right.

A.   You would have to ask the agents.

Steven Fuentes - Cross

Q.  But this entire situation escalated pretty quickly.  Is that fair to say?

A.  I don't know if it escalated very quickly, but it did escalate.

Q.  How long from the stop to when Mr. Quintanilla was on the ground, you would say?

A.  I couldn't -- I couldn't give an exact number, but it could -- I would assume it was minutes.

Q.  When did you show up at the scene?

A.  I showed up to the scene after the vehicle was already towed away.

Q.  So much later?

A.  Yes.

Q.  Okay.  So you didn't see Mr. Quintanilla-Chavez reach for anything, because you weren't there?

A.  Correct.

Q.  You can't say what he was thinking, because you weren't there and you didn't speak to him.  Is that fair?

A.  Correct.

Q.  And you don't know what his background was because you didn't check it; is that right?

A.  I don't know Mr. Quintanilla's background.  Correct.

Q.  So pretty much everything that's in your affidavit was by someone else?

A.  It's what I was told by other agents and officers.

Correct.

MS. DOUENAT:  Pass the witness, Your Honor.

THE COURT:  All right.

MS. WANNARKA:  I have no further questions.

THE COURT:  You may step down.  Thank you.

THE WITNESS:  Okay.

MS. DOUENAT:  And, Your Honor, for probable cause purposes, I just want to call my investigator, just to introduce these photographs.

THE COURT:  Okay.  You can step down.

THE WITNESS:  Thank you.

MS. DOUENAT:  I mean -- I'm so sorry.  I don't know if you have anybody else.

MS. WANNARKA: Nope.  Nope.  Done.

THE COURT:  All right.

MS. DOUENAT:  Thank you, Your Honor.

   So David Davila.

THE COURT:  Mr. Davila, if you could just pose right here -- or pause and --

THE CLERK:  Please raise your right hand.

   *(The oath was administered)*

THE WITNESS:  Good morning, Your Honor.

THE COURT:  Good morning.

David Davila - Direct

DAVID DAVILA, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. DOUENAT:

Q.  Mr. Davila, can you please state your name for the record.

A.  Yes.  My name is David Davila.

Q.  And how are you employed?

A.  I'm the chief investigator with the Federal Public Defender's office.

Q.  And did you work on Mr. Quintanilla-Chavez's case?

A.  Yes, I did.  Yes, ma'am.

Q.  And what did you do?

A.  I went out to the neighborhood, and I talked to some neighbors, and we took photographs of his vehicle and the trailer.

Q.  Okay.  So when you went to the neighborhood, which neighborhood did you go to?

A.  On Consuelo Street, off of Culebra.

Q.  Right.  And I'm going to ask you a little bit about Culebra Street --

A.  Okay.

Q.  -- since you know Culebra Street very well, don't you?

A.  Yes, ma'am.

Q.  How do you know it?

A.  I grew up in that neighborhood.  I grew up about -- from Consuelo, I probably -- just about five minutes from that area.

David Davila - Direct

As a kid, I threw the newspaper for nine streets, from Griggs all the way down to Alicia.  And I went to St. Mary's University so -- it's down the street.

Q.   And that's also nearby; is that right?

A.   Yes, ma'am.

Q.   Okay.  So do you know Culebra to be -- what kind of a street?

A.   It has grown to be a busy street.  Used to be just two streets [sic], and then it went to four and a turning lane.  So it's --

Q.   Do you know if it's busy in the morning?

A.   I would say it would be busy in the morning, people going to work and during the school year.  Yes, ma'am.

Q.   Did you actually go to Consuelo?

A.   Yes, ma'am.

Q.   Okay.  Do you know where Benrus is from Consuelo, how far?

A.   Benrus is just right around the corner from Consuelo.

Q.   About half a mile?

A.   From our client's house, it's about a half mile.

Q.   Okay.  So you mentioned that you went and talked to some of the neighbors?

A.   Yes, ma'am.

Q.   Okay.  And did you ask them specifically about this incident?

A.   Yes, we did.  We asked them if they had, like, Ring cams,

David Davila - Direct

do they have any videos, because people, you know, nowadays have videos around their house.  And one neighbor had taken a photograph of it and had -- and I asked him for a copy of it, and this is what he provided.

Q.  Okay.  So are you speaking of Defense Exhibit -- that's been marked as 2?

A.  Yes, ma'am.

Q.  Okay.  And so he was there?  He saw what happened that morning?

A.  Yes.  He said they closed off the street, and he had to go around, and he took a photograph of it.

Q.  Okay.  So there was enough law enforcement officers to close off the street?

A.  Yes.  That's what he said.

Q.  And the picture, does it -- he says that's the picture of what it looked like, the street looked like that morning?

A.  Yes, ma'am.

        MS. DOUENAT:  Okay.  Your Honor, at this time we'd like to introduce Defense Exhibit 2 into evidence.

        MS. WANNARKA:  No objection.  No objection to all three.

        THE COURT:  Okay.

        MS. DOUENAT:  Thank you, Your Honor.

        THE COURT:  All three are admitted, unless you want to use them to explain what --

MS. DOUENAT:  All right.  No.  I mean, I just -- I just want to establish what they are.  So then --

THE COURT:  Yeah.

MS. DOUENAT:  But thank you.  Yeah.

(Defendant's Exhibit Nos. 1 through 3 admitted)

BY MS. DOUENAT:

Q.  So then let me show you that's been marked as Defense Exhibit Number 1, I think you have in front of you.

A.  Yes, ma'am.

Q.  And you took this picture?

A.  Yes, ma'am.

Q.  And what is it of?

A.  It's a picture of the vehicle with the trailer -- the truck and the trailer attached.

Q.  And whose vehicle is this?

A.  It's our client's, Mr. Quintanilla.

Q.  And you took picture where?

A.  It was off of 38th Street.

Q.  Okay.  So a friend picked it up?

A.  Yes.  They have it over there.

Q.  Okay.  So this is the vehicle that was -- that was -- the day in question was used; is that right?

A.  Yes, ma'am.

MS. DOUENAT:  Okay.  And it's been introduced into evidence, Your Honor, so the Court can see the type of -- for

visibility purposes, what the trailer looks like.

THE COURT:  It's the defendant's vehicle with the trailer, or just the vehicle?

MS. DOUENAT:  The vehicle and the trailer is what he was in.

THE WITNESS:  And the trailer.

THE COURT:  Okay.

MS. DOUENAT:  And then Defense Exhibit 3 -- Your Honor, may I approach so I can give it to Mr. --

BY MS. DOUENAT:

Q.  Mr. Davila, you also took this picture; is that correct?

A.  Yes, ma'am.

Q.  And what does it portray?

A.  It's the inside cab of that Ram truck.

Q.  And is there anything on the -- on the chair that is of note?

A.  There's glass.

Q.  So that would have been glass from his window?

A.  I would believe so.  Yes, ma'am.

Q.  Okay.  And it's been introduced into evidence, Your Honor. It just shows the shards of glass.

And it broke -- can you explain how the shards of glass are?

A.  Some of them are connected.  Some of them are, you know, shattered.  When they break it, sometimes it stays, like, on a

sheet, and then some of them shatter.

Q.  But is it -- is it -- but they're little, small pieces, right?

A.  Yes, ma'am.  They're small pieces.

Q.  So is that because the glass is tempered glass?  I mean, it's a type of glass?

A.  It's a type of glass that is supposed to, you know, not -- when it hits, it's not like the old style where they would cut off in big chunks.  It shatters into small pieces, so you don't get injured.

MS. DOUENAT:  Okay.  Thank you.  Pass the witness, Your Honor.

MS. WANNARKA:  I have no questions.

THE COURT:  Okay.  You can step down.

THE WITNESS:  Thank you, ma'am -- Your Honor.

MS. DOUENAT:  We have witnesses for detention, though, purposes only.

THE COURT:  Okay.

MS. DOUENAT:  So I know that we have probable --

THE COURT:  Okay.  Should we take up the probable cause issue first, Ms. Douenat?

MS. DOUENAT:  Pardon me?

THE COURT:  I said, before we move on to the evidence I'll consider for purposes of detention, we should address the probable cause issue.

I have in front of me the pattern jury charge for this, which is 2.07 in the Fifth Circuit patterns.  And do you --

MS. DOUENAT:  I have argument.

THE COURT:  Okay.  I was, like, it might make sense to let her go first.  Then you can respond.

MS. DOUENAT:  The government has failed to establish probable cause, Your Honor.  We feel that there's no credible evidence that Mr. Quintanilla intended to assault, resist or impede any federal officer.  I know that it's not an intent requirement in the pattern jury charge and for federal assault, Your Honor.

But here, there's not even any evidence that there was any kind of motivation to hurt anyone.  And from the government's perspective, it seems like the agents hurt themselves in the process of trying to pull Mr. Quintanilla-Chavez out of the vehicle.

Everything we heard was filtered hearsay, not firsthand, not cross-examinable information because the witnesses are not here.  We can't cross-examine them.  So they're not -- it's evidence that shouldn't be considered, Your Honor.

My client is a man with no criminal history.  The Court has the pretrial service report, which makes a difference, especially because, here, he gets pulled over by an unmarked vehicle, and he stops.  But he doesn't stop in a very busy road.  He is conscious not to want to hurt anyone because --

including the officers or whoever's pulling him over, because of the fact that he just pulled right in from Culebra, on Consuelo Street.

He had a big -- a trailer, which takes a lot of room. So he pulled in. Two vehicles were able to park behind him and there were other vehicles in front of him. He stopped. There's no question at all that he wasn't trying to evade. There were no weapons. This were no firearms. There were no threatening messages.

Officers saw him on his phone. So, therefore, this escalated to breaking the window. This man is not a drug dealer. This is a status offense basically. He's here without papers. There's a removal order.

And the amount of force used to detain him and pull him out of the car was excessive, and it doesn't -- it doesn't speak to this man who had his dog in the vehicle and gets pulled over by police officers and does everything he's told within seconds. And this happened in minutes. It escalated in minutes.

Your Honor, we would argue there's no probable cause. They haven't showed that he actually was at all impeding or resisting arrest or tried to impede or resist arrest. And we don't even know if he understood what he was asked.

THE COURT: All right. Thank you.

Ms. Wannarka.

MS. WANNARKA: Your Honor, under the pattern jury

charge, it requires just one of the things occur, the assaulting, resisting, opposing, impeding and interfering. We only really need one. But in this case we have multiple of them that he -- we know law -- he knew it was law enforcement because he pulled over. He saw the lights and heard the sirens and pulled over.

Law enforcement then approached on each side, giving him commands. They are marked with insignia of law enforcement -- giving him commands to get out of the car. And he failed to do so multiple times. As the agent testified, it did escalate, but not quickly, because multiple times was he instructed to get out of the car, to roll down the window, and he did not. He sat there making a phone call, which was a threat to officer safety. And so, in so doing, he is impeding, and he is interfering, and he is imposing, and he is resisting at that moment.

But then Agents Will Carl -- Agent Carl, the victim, goes to the driver's side, repeats commands and then breaks the window. Then the defendant -- DPS is not in front of him yet. They're not in front -- they don't come till after. And so he's got plenty of distance to flee. That's when DPS cuts him off, is once he starts fleeing in the vehicle. So he's already resisted, opposed, impeded and interfered by not following law enforcement commands.

And then in his vehicle he further commits all of those

offenses again and, in so doing, as Section B requires -- if in the commission of those acts you inflict bodily injury, then that is what the B is.  And that's exactly what happened.  Because when the glass was shattered, he goes to evade forward in his vehicle.  That's when his opposing, impeding, interfering and resisting is what then caused -- those acts caused the bodily injury of the agent.

We know his foot didn't come off the brake because he intended to flee a second time in his vehicle.  He fled forward, causing the injury, and then he attempted to flee backwards.  Your foot coming off the brake doesn't go forward and then back backwards.  You've got to -- you've got to move that car.  And so by not getting out of the vehicle, he committed those offenses.  Then, by going forward, causing the bodily injury, he committed the offense.

And then even by moving backwards, almost hitting Agent Carl, who's having to move out of the way, he commits the offense again.

And then we're not done because he still won't get out of the car.  And they have to pull the glass.  ERO Agent Hernandez has to go in the cab and remove him.  He's still resisting.  It takes three officers to gain compliance of him.  He is -- he is the reason this was a melee.  He could have just complied, and he never did.  And so as a result, we do believe there is probable cause.

MS. DOUENAT:  Just brief rebuttal, Your Honor.

THE COURT:  Go ahead.

MS. DOUENAT:  Again, we're assuming a lot of information is accurate.  And the witnesses who were there did not come and testify.  The individual who did testify arrived when the truck was gone and the client was gone.  Or at least the truck was gone, if not the client.  But hours later.  So we don't know what commands were ordered and what was said to him.

What we do know is he pulled over.  We do know that he had a dog in the car.  We do know he was going to work.  We do know he pulled off of Culebra.

We don't know if he understood these were law enforcement officers or not.  What we do know is he may have thought they were law enforcement because there were lights and pulled over, but then things went pretty quickly haywire.  And for those reasons, especially because there's a lot that we don't know -- there is no -- the Court does have a picture that was taken by one of the residents and can actually see the vehicle on the street and the other vehicles in front of it and how the road was blocked for this.

So for those reasons, Your Honor, we feel there is no probable cause.

THE COURT:  All right.  Thank you.

All right.  Mr. Quintanilla, you were hearing your attorney argue and the attorney for the government.  And I just want to

reiterate for you and for the folks in the courtroom that today is not a trial. The standard here is not beyond a reasonable doubt. The standard is probable cause.

During a probable cause hearing, I'm allowed to consider evidence that I'm not allowed to consider if this were a trial, including hearsay testimony. These hearings happen very quickly after the offense. And the officer who testified, collected information from others involved. It's a standard thing that happens in these cases.

As more information comes to light through DOT cams and reports and everything else, you know, the veracity of each detail will be tested. But as to what has been presented today, through the officer's testimony, probable cause has been established on the elements for an 18 USC 111 offense. And so I will find that that exists.

I'll consider that testimony and the evidence presented -- or the cross-examination, I guess I should say, by defense counsel, on the matter of detention. You know, I will say that these -- part of the reason that I think that there are, you know, potential issues that could be issues for trial are that these situations are just -- they are difficult, people who are afraid right now because a lot of high-profile situations are getting attention. And unfortunately I think some of this is leading to fear that results in less compliance. When there's less compliance, then people get hurt, including officers and

including folks who are attempted to be detained for, you know, noncriminal immigration issues generally. So it's hard to see it all unfold. But the elements of the statute have been satisfied from a probable cause perspective.

We'll move on to detention. I do have the pretrial services report. Of course, it's very brief, which it is in cases where the defendant does not have status.

Ms. Wannarka, is there any other evidence on the matter of detention?

MS. WANNARKA: No, Your Honor.

THE COURT: Okay. All right.

MS. DOUENAT: We have three witnesses, Your Honor.

THE COURT: All right. You can proceed. Are we proceeding first with the one on Zoom or a different one?

MS. DOUENAT: We can. Your Honor, actually, I would -- I would prefer if we could proceed with the other two --

THE COURT: Okay.

MS. DOUENAT: -- so that the one on Zoom can hear the information as well.

THE COURT: All right. Just so that she knows when it's her turn to do things to the computer. Ms. Chaparro, my courtroom deputy.

MS. DOUENAT: Oh, I'm so sorry.

THE COURT: Yeah.

MS. DOUENAT:  I was like, wait, wait, what am I supposed to do with the computer?

THE COURT:  Okay.  So go ahead and call your first witness.

MS. DOUENAT:  So it's going to be -- the first witness is going to be Tatiana -- I'm sorry.  I wrote her name.  Hernandez?  No.  Herrera.  Tatiana Herrera.  So sorry.

THE COURT:  Okay.  Ms. Herrera, if you can just pause on your way up, Ms. Chaparro will swear you in.

THE CLERK:  Please raise your right hand.

*(The oath was administered)*

TATIANA ACEVEDO-HERRERA, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. DOUENAT:

Q.  Good morning.

A.  Good morning.

Q.  Could you please state your name for the record.

A.  Yes.  Tatiana Elicer Acevedo-Herrera.

Q.  And how old are you?

A.  I am 29.

Q.  And where do you live?

A.  I live on 715 Marquette Drive, 7823 [sic].

Q.  In San Antonio?

A.  Yes, ma'am.

Q.  And are you -- do you have status to be in this country?

A.   Yes, ma'am.

Q.   Were you born here?

A.   Yes, ma'am.

Q.   You are a U.S. citizen?

A.   Yes, ma'am.

Q.   And do you know a Mr. Jaime Quintanilla-Chavez?

A.   Yes, ma'am.

Q.   And is he the same one that's sitting next to me?

A.   Yes, ma'am.

Q.   Okay.  How do you know him?

A.   I met him when I was about 17 years old -- 16, 17 years old.  And we've been dating since.  We've been on an on-and-off relationship.  Currently we're -- we were together and fixing to move on and make it permanent.  We are currently engaged.  And we were in the process of, you know, moving into a new home.  If you see where he resides now, it's a smaller home just for himself.  So since we were getting together, making it official, we did have plans to purchase a home in the near future.

Q.   Okay.  Do you have a child?

A.   Yes.

Q.   And how old is your child?

A.   I actually have three children.

Q.   Okay.

A.   I have a -- he will be 14 tomorrow.  And then I have a

four- and a three-year-old.

Q.  Okay.  And what type of person is Mr. Quintanilla-Chavez with your children?

A.  He's their father.  Picks them up from school, arrives to doctor appointments, made it to every appointment of mine, has been completely involved.  My kids don't know any other man than him.

Q.  But he's not their father, though?

A.  Not biologically, no.

Q.  But he is their -- the one that they call "father"?

A.  If you would bring them here, that's who they would call "dad."  Yes.

Q.  So you've known him for a long time?

A.  Very long time.

Q.  And what type of person is he?

A.  An amazing person.  He's -- I just -- I'm speechless that I'm even here now for him.  He's very hard-working, has no -- I've never -- I've never seen him drink alcohol, never any -- doesn't abuse of any substances, drugs, legal, not legal.  He literally just works and comes home.

     If I'm being quite honest, this was the reason why a lot of our little breakups happened, because he just worked and came home.  And I am, as you could see, younger than him.  So I kind of wanted to be out and do my own things.  And he's just -- was work and home, work and home.

Tatiana Acevedo-Herrera - Direct

He's also a soccer player.  So Sundays he dedicated to playing.  He recently hasn't as much because he's even been working Sundays.  So it's literally -- his whole life since he's been here has been work.

Q.  And what type of work does he do?

A.  He does construction, framing and siding.

Q.  And so does he leave early in the morning?

A.  Yes.  Roughly around 6:00, 7:00, he'll be out the door. Doesn't come back home till around 8:00 at night at times, 9:00.

Q.  You know if he pays taxes?

A.  He does.

Q.  Would you be willing, if the Court were to release him on bond, be a surety or sign for him?

A.  Yes, ma'am.  Absolutely.

Q.  Be responsible for him?

A.  Yes, ma'am.

Q.  If there were conditions that were set by the Court for him to be allowed out on bond, you would make sure that he abides by those conditions?

A.  Yes, ma'am.

Q.  And if he doesn't, you would report him?

A.  Yes, ma'am.  Absolutely.

        MS. DOUENAT:  Pass the witness.

        MS. WANNARKA:  I don't have any questions.

THE COURT:  All right.

THE WITNESS:  Thank you.

MS. DOUENAT:  Your Honor, my next witness is Linda --

THE COURT:  You can step down.

THE WITNESS:  Thank you.

MS. DOUENAT:  -- Munguia.

I'm so sorry.

THE COURT:  Ms. Munguia.

MS. DOUENAT:  Thank you.

THE CLERK:  Please raise your right hand.

*(The oath was administered)*

THE CLERK:  Thank you.

THE COURT:  Come on up here.

MS. DOUENAT:  Yes.  So sorry.

THE COURT:  That microphone is adjustable.  So you can move it to where it's comfortable.

THE WITNESS:  Thank you.

ROSALINDA MUNGUIA, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. DOUENAT:

Q.  Good morning.

A.  Good morning.

Q.  Could you please state your name for the record.

A.  Rosalinda Munguia.

Q.  And how do you spell your last name?

A.   M-U-N-G-U-I-A.

Q.   And do you know a Mr. Jaime Alberto Quintanilla-Chavez?

A.   Yes, I do.

Q.   How do you know him?

A.   He was working with me on and off, so -- and also a friend. So not just an employee, but a friend.

Q.   So what kind of work does he do for you?

A.   Siding, Cornice.

Q.   And are you married?

A.   Yes.

Q.   And does your husband work with him as well?

A.   Well, actually, we own our own company.  So he's worked for us.

Q.   Okay.  So how long have you known him?

A.   I've known him since he arrived here, which was about 12 years ago.

Q.   Approximately, around 12 years ago?

A.   Yes.

Q.   Okay.  And he's worked since that time with you?

A.   No.  He actually started working with me in 2018.

Q.   Okay.  And do you know if he pays taxes?

A.   Yes, he does.

Q.   And how do you know that?

A.   I helped him prepare for the ITIN, to get -- established a number so he can claim his taxes.

Rosalinda Munguia - Direct

Q.  So you helped him with that from 2018 on?

A.  Yes.

        MS. DOUENAT:  Okay.  So, I mean -- Your Honor, we do have his income tax returns.  I mean -- because they're private information, I would prefer --

        THE COURT:  I don't think that Ms. Wannarka is going to contest --

        MS. WANNARKA:  No, I don't --

        MS. DOUENAT:  Okay.  All right.  I just would prefer not to submit them.

BY MS. DOUENAT:

Q.  Let me ask you this.  Do you know if he has a dog?

A.  Yes.  Rocky.

Q.  Rocky.  And what is Rocky?

A.  A weenie, Chiweenie or weenie dog.

Q.  How long has he had him?

A.  A while.  About a couple of months, maybe a year.  I'm not too sure but --

Q.  Do you know if he had him with him that day?

A.  Yes.

Q.  How do you know that?

A.  His friend, Pedro, informed us.  I was actually on a trip in Honduras, and he called us stating what had happened.  So that's how we got the information.

Q.  And talking about Honduras, that reminded me, does your

husband know Mr. Chavez-Quintanilla?

A.   Yes, he does.

Q.   I mean Quintanilla-Chavez.  I'm sorry.

A.   Yes, he does.

Q.   And how long has he known him for?

A.   Oh, all his life.  My husband's 40.  So he's known him all his life.

Q.   Because he's from Honduras as well?

A.   Yes.

Q.   But you're here legally; is that correct?

A.   Yes.  I'm a U.S. citizen.

Q.   And your husband is a childhood friend of his?

A.   Yes.

Q.   Pass the -- oh, would you be willing to also be a surety or at least be a third party custodian?

A.   Definitely.  He's a hard worker.  He's very responsible.  I mean, yes.  Why not?  He's awesome.

        MS. DOUENAT:  Pass the witness, Your Honor.

        THE COURT:  Okay.  Thank you.

        MS. WANNARKA:  I don't have any questions.

        THE WITNESS:  Thank you.

        MS. DOUENAT:  Your Honor, my last witness would be, Your Honor, an attorney who's on Zoom.

        THE COURT:  You can step down.

    You say "an attorney"?

Rosalinda Munguia - Direct

MS. DOUENAT:  Yes, an attorney.  Claudia Galan.

THE COURT:  All right.  Ms. Galan, if you could take yourself off mute and turn on your camera, my courtroom deputy will swear you in.

THE CLERK:  Ms. Galan, can you hear me?

THE COURT:  Oh, can't hear her.  Just give us one minute to get the tech working.

MS. DOUENAT:  Sure.

THE CLERK:  Okay.  Can you hear me now?

THE WITNESS:  I can hear you.

THE COURT:  Okay.

MS. DOUENAT:  Good morning.

THE CLERK:  Please raise your right hand.

MS. DOUENAT:  Oh, so sorry.  Sorry.

*(The oath was administered)*

THE CLERK:  Thank you.

MS. DOUENAT:  Good morning.

THE COURT:  Hold on one second.  I think we might have an echo because maybe somebody's sound needs to be turned down.  Should we try that?

Okay.  You can still hear me, Ms. Galan?

It looks like no.

THE CLERK:  Ms. Galan, can you hear me?

THE WITNESS:  Yes.  I can hear you.

THE COURT:  Okay.  Go ahead, Ms. Douenat.

Claudia Galan - Direct

MS. DOUENAT:  Sure.

CLAUDIA GALAN, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. DOUENAT:

Q.  Good morning.

A.  Good morning.

Q.  Could you please state your name for the record.

A.  Claudia Ivett Galan.

Q.  And what's your occupation?

A.  I'm an immigration attorney in San Antonio, Texas.

Q.  And how long have you been an immigration attorney?

A.  For six years now.

Q.  Are you pretty familiar with the bond process in
San Antonio with the immigration courts?

A.  Yes, sir, I am.

Q.  And so before I ask you about how it applies to
Mr. Quintanilla-Chavez, have you had an opportunity to hear the
evidence today in the courtroom?

A.  I did not hear any of the proceedings that were going on
because it was muted.

Q.  Okay.  Did you have a chance to review the complaint in
this case?

A.  I have reviewed the complaint and the PSR.

Q.  Okay.  And have you also reviewed maybe some notes from me?

A.  I have.  Yes.

Q.  Okay.  Based on the PSR and the complaint, you know what Mr. Quintanilla-Chavez is being charged with by complaint?

A.  Correct.

Q.  And based on your knowledge of his PSR, which means his criminal history, and no criminal history, do you know whether Mr. Quintanilla-Chavez is eligible for consideration for an immigration bond?

A.  Yes.  He is eligible for a bond.

Q.  And what factors does the immigration court consider when deciding whether to grant a bond?

A.  They consider whether he poses a danger to the community. And for that, they look at prior criminal history.  They also consider whether he poses a flight risk.  And for that, the judges will get eligibility for immigration relief in the court.  The respondent in this case, he's been here for several years, and he does qualify for relief in court.

        MS. DOUENAT:  Thank you.

    And I pass the witness, Your Honor.

        MS. WANNARKA:  I have no questions.

        THE COURT:  All right.

        MS. DOUENAT:  Thank you very much.

        THE COURT:  Thank you, Ms.Galan.

        THE WITNESS:  Thank you.

    Judge, may I be excused?

        THE COURT:  You may.

MS. DOUENAT:  And, Your Honor, the only other thing is if the Court -- the Court can take judicial notice of INA 1226, which is the apprehension and detention of aliens, which is 8 USCA Section 1226.  I have a copy for -- we can introduce it as an exhibit.  Exhibit would be 4; is that right?  Exhibit 4.  And we're tendering a copy to the government as well as the Court.

THE COURT:  Thank you.

MS. DOUENAT:  And then we just have argument, Your Honor, after that.  So we'll let the government go first, and then we can argue.

THE COURT: All right.  Go ahead.

MS. WANNARKA:  Your Honor, the government is asking for detention in this case primarily because the defendant does not have status to be here.  Whether or not he's eligible, we don't know that.  We don't know -- we just don't know.  That's not an issue for this Court.  It's an immigration court issue.  And we don't know what would happen in that -- in that court.

And so -- but as of right now --

THE COURT:  I think the issue here, Ms. Wannarka, is just that, you know, obviously, we have the fact that he doesn't have status.  But, you know, as is sometimes the case in these situations, he has been here a very long time.  He's not someone who was just picked up.  He does have a place to live, people to live with and something to do gainfully.  And

so that's not the typical situation that we're in.

I understand that ICE has a detainer.  And so if I order him released, I know the government has to appeal that.  And so then, even if the district court affirms my release order, he will be released to the custody of ICE.  Then he'll presumably -- what happens there, I have no control over, nor do you or Ms. Douenat, because then it goes into that particular proceeding and posture.  And it gets -- that'll get resolved however it gets resolved.

But, you know, from the perspective of the federal court and, you know, the way that I think that we look at it is, the executive has the prerogative.  They can -- you know, they can prosecute, or they can deport.  If they want to deport somebody before they're prosecuted, I mean, that's up to the executive branch.

So focusing on the issues here, this isn't somebody with a criminal history.  I mean, I suppose there is going to be an argument, due to the circumstances of the arrest itself, that there might be a flight risk and/or some danger because of how the situation went down.  I mean, I think it was a pretty quick and difficult situation.  So I don't know how much that really weighs under the factors in favor of detention.

So besides that and his lack of legal status, are there any other issues that would, you know, cause the Court to, under the factors of the Bail Reform Act, make detention the

appropriate choice?

MS. WANNARKA: Well, Your Honor, just -- yes. To highlight, not to reiterate, but to highlight what the testimony was, the defendant had multiple offramps to comply, multiple opportunities to comply. In fact, he started out in compliance and then chose to be noncompliant. And he had multiple opportunities to roll down the window, to get out of the car, and failed to take all of those offramps, so much so he had to be physically removed from the vehicle and then taken into custody, fighting multiple officers.

And in his fleeing in the vehicle, which is extremely in and of itself dangerous, injured a special agent. And so paying taxes regularly doesn't make one not violent. So while --

THE COURT: No. I think that goes more to the flight risk issue, right? You know, that he has a stable way to live and be here, that often folks who are here without status don't have.

MS. WANNARKA: In this case this is a dangerousness issue. He caused extreme danger that day, and it was of his own doing. He's not here legally. Doing things right when you're here illegally doesn't make you legal. He's still not here legally, and we ask that he be detained.

THE COURT: All right. Thank you.

MS. DOUENAT: Your Honor, I won't touch on the

immigration thing. I think the Court was eloquent enough to express the issues with immigration court, and that it's -- whatever is going to happen in immigration court is going to happen. There's no mandatory detention for Mr. Quintanilla-Chavez. That we know for a fact; that he is eligible for bond.

THE COURT: At least yet.

MS. DOUENAT: Right. But even -- true. There is no conviction. He is not convicted of this charge. This is -- this is just a complaint. The danger was manufactured. It wasn't inherent. The government created its danger. They are trying to blame him for it. They call his reaction "resistance," when it was fear. They escalated it pretty quickly. They created the threatening environment by having five or six vehicles, you know, on him, all unmarked.

He was passive in the vehicle. He was on his phone. And then they broke the glass.

So, Your Honor, those are the reasons why -- those factors themselves, we know for a fact, are true. We're asking the Court to release him on bond. We know that he's been well known. He's a hard worker, doesn't drink, is a father to three children, pays taxes and has also a four-legged child, a dog, that was with him the day that he was taken -- he was going to work. And he was worried about him as well.

For those reasons, Your Honor, we are -- we do believe

there are conditions that can be set by this Court for Mr. Quintanilla-Chavez' appearance, and that he's not a flight risk or a danger.

THE COURT: Okay. All right. Well, thank you for the arguments in this case.

Under the Bail Reform Act, there are two factors I'm supposed to look at. One is whether the defendant poses a risk of non-appearing. I think, given his ties to the community and a family and long-term history here, that that is not a big concern, especially if there's a way to work through the immigration issues. So I think this comes down to dangerousness, whether the defendant poses a danger. And that is a standard of clear and convincing evidence that there is a dangerousness that can't be mitigated with court-ordered conditions.

I think there likely are conditions here that could mitigate dangerousness. I believe that the defendant, you know, could be put on a monitor to deal with his -- you know, to confirm that he's still basically doing all the things that he has been doing prior to being arrested: Working and going home and, you know, being with his family and close relations. Those are all things that I am not concerned about.

I think, on the dangerousness front, it's just this one particular situation. And the way it unfolded isn't enough to show that this defendant is, you know, inherently dangerous.

And so I will order that he be released, with a caveat that before I could release him, I know that the government is going to appeal because it's a mandate that they have to in these cases. And so I will -- I'll give you -- I'll give the government, since it's Thursday, you know, until Monday morning to make the appeal.

In the interim, I would just ask that pretrial touch base with the witnesses that were presented today, who've offered to be custodians, because I would require a custodian in this case. I would likely require a financial surety as well. And so if you could collect that information, then I would ask for pretrial's recommendations on those conditions.

Mr. Quintanilla, this is, you know -- this is just me following the law as I understand it. But I just will tell you that these are -- these are difficult cases, and the district court is going to be confronted with all of these same complex issues again.

But that's my -- that's my ruling. I will write something brief so there's a record, and just ask, Ms. Chaparro, if you could request a transcript for the district court as well. All right.

I inferred your appeal.

MS. WANNARKA: Yes.

THE COURT: Confirming on the record.

MS. WANNARKA: Respectfully.

MS. DOUENAT:  I'll be ordering that transcript, Your Honor.

THE COURT:  Okay.

MS. DOUENAT:  So I'll give the parties -- all the parties a copy of it --

THE COURT:  All right.  Thank you.

MS. DOUENAT:  -- since we'll need it for the district court.

THE COURT:  Okay.  Thank you.

And we're in recess.

* * *

*(11:14 a.m.)*

-oOo-

I, court approved transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


Date:  6/27/2025      /s/ Chris Poage
                      Approved Transcriber