FILED

June 27, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ ac
                                    DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| | § | CASE NO. |
| vs. | § | SA:25-MJ-947 |
| | § | |
| (1) JAIME ALBERT QUINTANILLA-CHAVEZ | § | |
| | § | |
| | § | |

## ORDER

Before the Court is the Government's Motion to Detain [#2]. The Court held a hearing on this motion on June 26, 2025, at which the Government, Defendant, and his attorney appeared. The Government's motion requests a detention hearing on the grounds Defendant represents a serious risk of flight, and it argues Defendant should be detained without bond because no conditions or combination of conditions will reasonably assure Defendant's appearance as required. In its motion, the Government does not assert the safety of the community as a ground for detention, and therefore, it arguably has waived its right to do so. *See* Mtn. to Detain [#2], at 2. Nevertheless, at the hearing, the Government asserted that the safety of the community is the primary reason Defendant should be detained. After considering the evidence and hearing testimony, the Pretrial Services Report,[1] and the parties' arguments on the issue of detention, it is ordered that the Government's Motion to Detain [#2] is **DENIED**. A separate order setting conditions of release will be entered after Pretrial Services has an opportunity to identify a financial surety and third-party custodian and recommend other conditions.

---

[1] Due to Defendant's lack of legal status, pursuant to the policy of the Pretrial Services Office, this report was prepared based only on information provided by the arresting officers and a criminal background check.

1

DEFENDANT'S EXHIBIT

3

After the Court issued its oral ruling on the motion to detain, the Government orally moved to stay the Court's release order, which the undersigned granted, ordering that the undersigned's order be stayed until noon on Monday, June 30, 2025, so the Government has an opportunity to appeal to the District Court.

After stating reasons on the record for denying the Government's motion to detain, the undersigned indicated that a written order would be filed that memorializes the reasons why release on the imposed conditions is appropriate in this case under the Bail Reform Act ("BRA"). For the reasons stated on the record during the hearing and incorporated herein, this written order serves as a summary of the reasons in the event the Government appeals the decision.

## ANALYSIS

The anchoring point of the analysis is the Constitution's prohibition of excessive bail. U.S. Const. Amend. VIII. And in the present setting, the BRA sets forth the limited circumstances under which a defendant may be detained prior to trial. 18 U.S.C. § 3142; *see also U.S. v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."). The presumption under the BRA is that a defendant will be released at the initial appearance, unless the defendant poses a risk of nonappearance or a danger to another person or the community. *See* 18 U.S.C. § 3142(b). In such situations, the BRA instructs the Court to order bond subject to the least restrictive conditions that would reasonably assure the safety of the community and the defendant's presence at trial. *See* 18 U.S.C. § 3142(c).

The BRA includes provisions specifically addressing defendants who lack legal status in the United States, yet none of these provisions requires automatic detention, or even creates a presumption of detention, in every such case. If the defendant is not a citizen and lacks legal status to live and work in the United States, and the Court finds that the defendant may flee or pose a danger to any other person or the

2

community, then additional considerations are triggered. In such circumstances, the Court "shall order" the defendant's temporary detention for up to ten days so that immigration officials can determine whether they desire "to take such person into custody." *See* 18 U.S.C. 3142(d). If the officials "fail[] or decline[] to take such person into custody during that period," then—the BRA instructs—the defendant "shall be treated in accordance with the other provisions" of the BRA, "notwithstanding the applicability of other provisions of law governing release pending trial or deportation or exclusion proceedings." *Id.* In other words, after this temporary detention period, an alien defendant should be released unless there is no set of conditions the Court could impose that would reasonably assure the alien defendant's presence or the safety of the community. *See* 18 U.S.C. § 3142(e).

Although the BRA requires an individualized bail determination, it in some cases imposes a presumption that there are no conditions or combination of conditions that will reasonably assure the community's safety and the defendant's presence. For example, if the Court finds probable cause to believe a defendant committed a crime enumerated in Section 3142(e)(3), then there is a presumption that no set of conditions will reasonably assure the safety of the community or the defendant's presence, although an individualized assessment is still required and the presumption is rebuttable. But in situations where no presumption is triggered, and where the BRA requires a hearing, the BRA directs the Court to consider the factors listed in Section 3142(g) and make an individualized assessment concerning whether a particular defendant poses a risk of non-appearance or danger. *See* 18 U.S.C. § 3142 (e), (f), (g). Notably, cases involving alien defendants without legal status are *not* among those for which an automatic presumption is created.

The government, as it does in virtually every case in this Court that involves a defendant without legal status, argues that Defendant's lack of legal status and the existence of an immigration detainer mandate his detention. However, although the BRA articulates several factors the Court should balance

3

and consider in determining whether a defendant poses a risk of flight or non-appearance, immigration status is not explicitly mentioned. *See* 18 U.S.C. § 3142(g). Of course, the lack of legal status often means as a practical matter that alien defendants have certain characteristics that should be considered and argue for detention—like unstable employment in the District or weak ties to the District. *See* 42 U.S.C. § 3142 (g)(3)(A) (setting forth the characteristics of the defendant that should be considered in deciding whether the defendant poses a risk of non-appearance or danger). But such characteristics are not always present and vary in degree even amongst alien defendants subject to immigration detainers. Nevertheless—and notwithstanding the absence of any provision in the BRA mandating detention in every case involving an alien not lawfully present as well as the BRA's command to conduct an individualized determination in every case—the Government would have the Court treat the lack of status and detainer as dispositive on the question of detention.

The reasonable conclusion that alien defendants without legal status should not be treated differently (or worse) than other defendants is reflected in the plain text of the BRA. The statute, as mentioned, specifically addresses aliens and directs up to 10-days' temporary detention of defendants lacking legal status, provided there is an initial finding that they pose a risk or flight or danger. And the statute then explicitly directs that if after ten days the defendant is not "taken into custody" by immigration officials, then "such person shall be treated in accordance with the other provisions of this section, notwithstanding the applicability of other provisions of law governing release pending trial or deportation exclusion proceedings." 18 U.S.C. § 3142(d). As the Second Circuit has explained, this provision imposes a ten-day limitation on the Court's authority to release a defendant pursuant to the BRA. *United States v. Lett*, 944 F.3d 467, 471–72 (2d Cir. 2019). But the BRA's mandate that the defendant "shall be treated in accordance with the other provisions of this section, notwithstanding the applicability of other provisions of law governing release pending trial or deportation or exclusion proceedings" does not

4

preclude immigration authorities from detaining the defendant or pursuing parallel deportation proceedings; "it merely clarifies that 'the presence of an [immigration] detainer and the threat of potential removal alone are not sufficient to deny BRA pretrial release.'" *Id.* (quoting United States v. *Soriano Nunez*, 928 F.3d 240, 245 n.4 (3d Cir. 2019)). "In other words, the district court must apply the BRA as it would to any other criminal defendant, notwithstanding the existence of any parallel proceedings" And notwithstanding the Government's repeated attempts to create a *de facto* rule requiring detention of aliens that is not supported by the BRA's text. *Id.*

And so, in this case, there is no automatic requirement for detention and no presumption of detention. Thus, whether Defendant should be detained by this Court on the charge pending turns on whether the Government has proved either, (1) by the preponderance of the evidence, that Defendant poses a risk of not appearing that cannot be sufficiently mitigated with conditions, or (2) by clear and convincing evidence that Defendant poses a risk of danger to the community that cannot be mitigated by conditions. *See* 18 U.S.C. § 3142 (e), (f). The Government has not met its burden to prove either.

### 1. Risk of Non-Appearance

With respect to the only ground urged in the Government's Motion to Detain, this Defendant does not pose a risk of non-appearance that cannot be mitigated with conditions, including but not limited to a GPS monitor, a surety, and a third-party custodian. Defendant has lived in the United States for more than a decade. He has no criminal history. He has never even been arrested. He is engaged to marry a United States citizen. By all accounts he lives a quiet, hard-working, tax-paying life. He does not drink or use illicit substances. Defendant is from Honduras. A childhood friend of his from Honduras and this friend's wife own a construction business in San Antonio. The wife, a United States citizen, testified at the hearing that Defendant has worked for the construction company and paid his taxes for the past six years. She stated that he is a dependable worker and could continue working for her company if released

5

on bond. Defendant's long-term working relationship with his friend's construction company and his engagement to a citizen demonstrate deeper ties to the community than most defendants who lack legal status.

Defendant also does not have strong incentives to flee. Defendant's presentation at the hearing shows that Defendant is contesting the Government's version of events that gave rise to the charge against him, and he may ultimately not be convicted. Also, Defendant has lived in Texas for 12 years and does not have another life in Honduras to easily return to. Fleeing the jurisdiction would mean abandoning his fiancé, his home, and his source of income. And fleeing prosecution but then returning to his life would not be realistically possible. Defendant's fiancé is known to authorities, as is his place of residence and only place of employment.

The Court specifically notes that it does not consider dispositive the fact that ICE could possibly deport Defendant before he is tried and while he is released on bond as a factor to hold against Defendant in terms of risk of non-appearance. Nothing in the BRA's text mandates such an approach. Whether or not Defendant is deported immediately, detained in ICE custody, or released on an immigration bond is up to the executive branch. Such decisions are the prerogative of the executive branch, as is the decision to prosecute him for the offense charged here. The executive branch has the discretion to deport him without first prosecuting him or to try him and then deport him. If anything, the existence of a detainer cuts against finding a risk of flight. Defendant will be released by this Court from the custody of the U.S. Marshal to the custody of ICE, and thus there is virtually no risk that he will flee voluntarily.

## 2. Risk of Danger to the Community

At the hearing, the Government shifted its focus and urged, almost exclusively that Defendant presents such a risk to the community that he must be detained pending trial. In this regard, the

6

Government must prove by *clear and convincing evidence* that Defendant poses a risk to the community that cannot be mitigated with conditions. It cannot.

To begin with, Defendant, despite living in the United States for several years, has no criminal history. None. Yet the Government urges that he presents such a risk to the community that he must be detained. The Government's entire case for its argument that Defendant poses a risk of danger (which again, was not asserted in its written motion to detain), is based on the events giving rise to Defendant's arrest. But given the context and circumstances of the incident, even as presented at the hearing primarily from the perspective of the Government, that single incident is not enough to show by clear and convincing evidence that Defendant presents a risk of danger to the community.

The quality of the Government's evidence of danger bears mentioning. During the hearing, the Government presented only second-hand, hearsay evidence about the events that led to Defendant's arrest for violating 18 U.S.C. § 111—assaulting, resisting, or impeding a federal officer. The HSI agent who testified, Special Agent Steven Fuentes, was not present during the incident in question and only arrived at the scene after Defendant had been detained and his vehicle towed. He did not view or review any video of the incident. His only source of information about the incident was from his discussions with officers who were present. None of those officers was present or testified at the hearing. No video of the incident was presented at the hearing.

In any event, according to Special Agent Fuentes, Defendant was of interest to authorities because a Final Order of Removal had been issued for Defendant by an immigration judge. In an inexplicably militant response to this order of removal, multiple agents and officers from HSI, ICE-ERO, and Texas DPS were deployed to Defendant's home around 7:00 a.m. on June 20, 2025. They observed a man matching Defendant's description leave the home and get into a Dodge Ram truck. Defendant is slight in stature. He was not armed, and authorities had no reason to suspect he was or would be dangerous. Again,

7

Defendant has no criminal history. Defendant's truck had a trailer attached, carrying construction tools. Agents from three agencies followed the truck. Shortly after Defendant left his home, a probable cause traffic stop was initiated due to an expired license plate on the truck. One of the unmarked cars activated emergency lights, and Defendant turned off Culebra Road onto a less busy residential street and pulled over without incident. Other agents and officers parked further down that street. At this point, Defendant—who had no reason whatsoever to anticipate an interaction with authorities—was pulled over by an unmarked vehicle that displayed emergency lights.

Things then escalated. One HSI agent approached the driver's side and another the passenger side. According to Agent Fuentes, the driver-side agent was issuing commands, such as a command to roll down the window. Defendant does not speak English. When asked whether the commands were issued in Spanish, Special Agent testified hesitantly but ultimately that they were issued in both languages (although he was not there, and it was unclear whether this was explicitly told to him). Defendant did not immediately roll down the window or open his door in response to the commands. He stayed inside his locked car, attempting to contact someone with his phone. He did not display weapon. The agents did not know who he was contacting. The agent on the passenger side came around to the driver's side, too. That agent also issued commands to roll down the window and unlock his door. Defendant did not comply.

At this point, the HSI agent escalated the interaction by opting to use his glass-breaking tool to break Defendant's window. He did so, and the window glass shattered, although most of it stayed in a sheet. According to information provided to Special Agent Fuentes, who himself was not there, Defendant's car at that point lurched forward. The Government contends Defendant was trying to drive away, although defense counsel argues that Defendant was merely reacting in fright to having the driver's side window shattered. Defendant's state of mind at this moment in time is central to the offense for which he is charged and for which at this point in the proceedings he must be presumed innocent. When

8

the car moved forward, according to Special Agent Fuentes, glass from the broken window cut the HSI agent's arm. Another officer moved a vehicle in front of Defendant's truck so that Defendant had to stop again, and an agent also pulled in behind him. Defendant reversed into the vehicle behind him. At this point, he was effectively boxed in between the law enforcement vehicles.

The same agent who broke the window again approached Defendant's car, removed the sheet of broken glass from the driver's side window, and unlocked Defendant's car from the inside. According to the Government, Defendant did not obey commands to get out of the car, and so he was pulled out, arrested, and taken into custody.

The Government argues that this single incident alone constitutes sufficient evidence of Defendant's dangerousness to mandate his detention. But when the situation is considered in context, it is equally as consistent with a terrified, surprised person's reaction to suddenly being pulled over by unmarked cars and surrounded by multiple officials as it is with a person seeking to flee or assault arresting officers. There are also significant questions to be asked and answered about the agents' actions in escalating matters by breaking the window. Why didn't agents simply box in Defendant's vehicle and work to get him to exit peacefully? Could they have called for someone to negotiate or talk to Defendant before resorting to overt violence? Could they have allowed more time to pass before escalating matters, perhaps to allow Defendant an opportunity to reconsider his decision not to exit as commanded?

Moreover, multiple conditions, including Pretrial supervision, GPS monitoring, and a requirement that Defendant comply with conditions or face revocation would mitigate any alleged danger posed by Defendant. The fear that Defendant demonstrated during the incident is particularly unsurprising given the current climate. Media coverage of aggressive, enhanced immigration enforcement efforts is dominating the news, as are stories of non-criminal aliens being deported to countries they are not from, sometimes with little or no opportunity to have their cases heard. Defendant's reaction has to be

considered in that context when evaluating whether he poses a particular danger to the community that cannot be mitigated.

## CONCLUSION AND ORDERS

The Court's task is to determine whether Defendant is bondable under the BRA. Based on balancing the factors discussed above, the Court concludes that he is. Therefore,

**IT IS ORDERED** that the Government's Motion to Detain [#2] is **DENIED**;

**IT IS FURTHER ORDERED** that Defendant be **RELEASED** on conditions imposed by separate order, after consultation with Pretrial Services and subject to Pretrial identifying a third-party custodian and surety. A hearing to address Pretrial's proposed conditions will be set by separate order.

**IT IS FINALLY ORDERED** that the Government's oral motion to stay the Order of Release is **GRANTED** until noon on June 30, 2025.

Signed this the __27__ day of __June__, 20__25__.

_____
**Elizabeth S. Chestney**
**U.S. Magistrate Judge**

10