IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

UNITED STATES OF AMERICA, .
.
.
vs. . DOCKET NO. 5:25-CR-388-XR
.
JAIME ALBERTO QUINTANILLA .
CHAVEZ, .
.
DEFENDANT. .

TRANSCRIPT OF MOTION HEARING PROCEEDINGS
BEFORE THE HONORABLE XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE
JULY 10, 2025

APPEARANCES:

FOR THE PLAINTIFF: SARAH WANNARKA, ESQUIRE
UNITED STATES ATTORNEY'S OFFICE
601 N.W. LOOP 410, SUITE 600
SAN ANTONIO TX 78216

FOR THE DEFENDANT: MARINA DOUENAT, ESQUIRE
FEDERAL PUBLIC DEFENDER'S OFFICE
727 E. CESAR E. CHAVEZ BOULEVARD
SUITE B-207
SAN ANTONIO TX 78206

REPORTED BY: GIGI SIMCOX, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
SAN ANTONIO, TEXAS

# INDEX

DELFIDA ACOSTA
Direct Examination By Ms. Douenat 22

*(San Antonio, Texas; July 10, 2025, at 1:30 p.m., in open court.)*

THE COURT: Okay. 25CR388, United States versus Jaime Alberto Quintanilla Chavez.

Appearances, please.

MS. WANNARKA: Sarah Wannarka for the United States.

MS. DOUENAT: Good afternoon, Your Honor. Marina Douenat on behalf of Mr. Jaime Quintanilla Chavez.

THE COURT: Thank you.

So we're here on the government's motion to set aside the order issued by the magistrate judge to give Mr. Quintanilla Chavez a pretrial release, and then we're also here on the defendant's motion to have a reconsideration of the initial probable cause finding that was reached in the last case based upon misrepresentations made by the special agent in this matter.

MS. DOUENAT: So, Your Honor, I filed it before the indictment came through, so the probable cause matter is moot at this point, Your Honor.

THE COURT: Okay.

MS. DOUENAT: I mean, they filed a notice on a Tuesday night. Wednesday, I filed my response, and then that evening around 5:00 our office got notice that he had been indicted. So probable cause is moot at this point, Your Honor.

THE COURT: So then you anticipate filing -- what? -- a motion to dismiss the indictment later?

MS. DOUENAT: Yes, Your Honor, I am.

THE COURT: Yeah. So we'll have a discussion about that, even though we won't have a full hearing on that and a ruling, but I do want to have an understanding of what went on here.

So let me start this whole matter first by saying that when any law enforcement officer or special agent files an affidavit before a magistrate judge, the magistrate judge relies upon, and I do when I'm signing search warrants -- any judicial officer relies upon the truth and veracity and accuracy of the affidavit sworn to by the affiant.

And so in this case, the affiant was Special Agent Fuentes, and it has been conceded by the government that the representations made by Special Agent Fuentes were, at best, incorrect. I'm more concerned, frankly -- and to put it bluntly -- that there was active misrepresentations and lies. So that's where we're at today, and we will begin with that.

So I want to hear what the government contends it believed occurred on the day of June 20, 2025. And, frankly, what I want to hear is, okay, if there was no A-File on this defendant and if there was no previous order of removal by any immigration authority, how is it that agents happened to go to Benrus Street in San Antonio, Texas on June 20, 2025 in the

first place?

MS. WANNARKA: Yes, Your Honor. Thank you.

Your Honor, the representation that there was an order of removal was a mistake. It was not a lie. It was not an intentional lie at all. It was a mistaken belief that the reason the encounter was made was based on an order of removal. In fact, the government would like to offer Government's Exhibit 1. If I may approach?

THE COURT: Yes.

MS. WANNARKA: As some background, there were a number -- the operation was led by ICE ERO. And ICE ERO, prior to that day, had received an HSI tip line of allegations of domestic violence against this defendant. Because of these allegations of domestic violence, that is how he came to be encountered for removal arrest.

THE COURT: So --

MS. WANNARKA: The HSI -- I'm sorry.

THE COURT: So I was going to say, okay, so it was a tip, right? So we've militarized all the terms in this case. "Intel." It was a tip. And so, normally, before a judicial officer -- if this was a normal case, before a judicial officer would sign off on anything, the tip has to be corroborated by reliable informants that in the past had provided the law enforcement authorities with credible evidence. Was this tip corroborated?

MS. WANNARKA: I don't know if anyone talked to the lady who made the tip. It's on the very last page, but it was not an anonymous tip. It was a female in Alpine, Texas. Gave her full name, her full address, her full identifiers, and explained that her daughter lives here in San Antonio and is in a contentious domestic violence relationship with this defendant. And it was that that caused him to be highlighted.

Now, that's different --

THE COURT: Okay. Let me stop there. So he doesn't have an A-File. So this normally would be just, okay, something for local law enforcement authorities to investigate whether or not spousal abuse was taking place. How do they target that this guy was allegedly here without documentation?

MS. WANNARKA: Because they had done some research. And, in fact, at the top --

THE COURT: But if there's no A-File, who do -- where is this research coming from?

MS. WANNARKA: Well, that's it. They couldn't find anything in the United States that caused him to be a citizen.

Additionally, the tip from the mother of the victim -- I don't know anything about the allegations of domestic violence -- was that he was illegally present. And so ICE ERO did research, was unable to find any citizen documents, anything that showed he was a citizen at all or had any legal basis to be here. Because if he had any legal

basis, if he had an asylum claim, if he had parole, if he had temporary protective status, if he had any of those things that would allow him to be an alien lawfully present, they would have been in an A-File. And he had -- his name and his date of birth had no A-File at all, and so that was the basis behind the enforcement, the immigration enforcement.

THE COURT: So they go to his house on Benrus Street. They don't have an administrative warrant for his arrest. How are federal law enforcement officers doing this in the first place? What authority is given to them just to pick out somebody who they believe, because they can't find any U.S. citizenship -- what gives them the authority to just go to houses randomly and try to pick up people?

MS. WANNARKA: Well, they didn't. They waited until he left his home and was in the vehicle, so they didn't go to or in his home. It was a probable cause stop to investigate whether or not he was illegally present in the United States.

THE COURT: So that's a problem too. So as -- what he -- what Special Agent Fuentes testified to in his affidavit was that this gentleman, this defendant, left the house on Benrus, got in some white Dodge Ram, went some distance, and that allegedly there was an expired license plate. Under what authority does federal HSI agents have to make a vehicle stop?

MS. WANNARKA: It wasn't necessarily a stop based -- you know, it was expired registration. It was a probable

cause stop for the immigration violation, that he was here illegally.

THE COURT: But that's not what he -- that's why -- this agent made numerous representations in this affidavit. He testified that the reason the stop was made was for an expired license plate. That's what he testified to. Was that just another error?

MS. WANNARKA: Your Honor, he wasn't lying. There was no intentional lying.

THE COURT: Well, I'm not saying lying. I'm saying was that an error?

MS. WANNARKA: He must have just misrepresented what was going on.

THE COURT: Okay. So your argument is the stop of the vehicle was made by federal HSI officials based on probable cause that they thought an alien was driving that vehicle?

MS. WANNARKA: That's right. Exactly. And the reason he was identified for immigration proceedings was because of the domestic violence allegations.

THE COURT: Okay. Now, so stop is made. He stops the vehicle. And what Special Agent Fuentes testified is that he was uncooperative, failed to lower his driver's side window and wouldn't answer questions. Is that the evidence the government intends to bring in this case for trial?

MS. WANNARKA: Yes, Your Honor.

THE COURT: Okay. So at one point, once -- allegedly -- this defendant is failing to answer questions and is uncooperative, a federal HSI official -- and I'm making a clear distinction between federal authorities and the DPS officer who apparently was behind the scene and not doing this stuff; am I correct?

MS. WANNARKA: You are correct.

THE COURT: Okay.

MS. WANNARKA: They were on the team, but they weren't making this initial encounter.

THE COURT: How is it that a federal HSI official has the authority to try to open a car without a search warrant?

MS. WANNARKA: At that time, Your Honor, it was -- they believed it was an officer safety issue, because he was not --

THE COURT: Because he was using his phone?

MS. WANNARKA: Yes. And he was close to the house, and they were afraid that he was calling for people to come from the house for some sort of encounter.

THE COURT: That's quite a stretch. And I'm not believing that, but okay. Let's go ahead. So the door is locked, and so at some point, a federal HSI official takes some kind of baton and smashes the window.

MS. WANNARKA: Yes, Your Honor.

THE COURT: What authority was given to that official to smash the window?

MS. WANNARKA: It wasn't. It was part of the process of getting the defendant out of the vehicle into custody, and the reason why that step was taken was because they were fearful for officer safety.

THE COURT: So now what's before me is an assault on a public official, a federal public official. So there were no assaults -- tell me if I'm wrong. What's going to be the evidence in your case here, did he assault any state official acting in a federal capacity?

MS. WANNARKA: No, Your Honor.

THE COURT: So did he assault one or more federal officials?

MS. WANNARKA: One HSI agent.

THE COURT: Okay. So the agent who used the baton and smashed the window -- as I understand it, there's two different assaults -- and you correct me if I'm wrong. One is that he smashes the window and that at some point the car goes forward, and because the car goes forward, the agent who smashed the window got his arm cut?

MS. WANNARKA: That's correct, your Honor. The car went forward because the defendant was fleeing in his car.

THE COURT: So how is it that if he had no authority to smash the window and he self-caused that window to be

smashed, how is it that you're going to be able to prove that that was an intentional assault when that federal official committed the smashing of the windows in the first instance?

MS. WANNARKA: Your Honor, the pattern of guidelines for 111(b) do not require an intentional assault. What it requires is that --

THE COURT: Oh, it does require intentional assault.

MS. WANNARKA: The defendant resisted, impeded the arrest --

THE COURT: It's all intentional --

*(Crosstalk)*

MS. WANNARKA: -- but such acts of the resisting, of the impeding, caused bodily injury.

THE COURT: But he caused the injury to himself by smashing the window in the first instance.

MS. WANNARKA: If the defendant hadn't evaded in his motor vehicle, the injury wouldn't have happened. It was the defendant's evading and resisting. Those acts caused the bodily injury.

THE COURT: Okay. I've got questions for you on that. So when we get the motion to dismiss the indictment, you can be in anticipation of all my questions.

MS. WANNARKA: Yes, sir.

THE COURT: Okay. Now, the second assault is what?

MS. WANNARKA: There is not a second assault.

THE COURT: So that's what's confusing to me. Again, I'm relying on his affidavit. He talks about a reverse of the car and that it hit some vehicle. And are you arguing that that is going to be a second assault or obstruction that you're going to bring before this jury?

MS. WANNARKA: No, Your Honor. We were looking at that as a -- the motor vehicle being used as a deadly weapon, but that is not what we are going forward with.

THE COURT: Okay.

MS. WANNARKA: The way it's defined under the sentencing guidelines, "motor vehicle" is not a deadly weapon.

THE COURT: So you know the questions I'm going to have when we have a hearing the second go around.

Let's talk about the government's motion now to set aside the magistrate's order regarding pretrial release. So you are arguing, as I understand it, safety risk -- pardon me -- flight risk and danger to the community?

MS. WANNARKA: Yes, Your Honor.

THE COURT: So with regard to flight risk, what is your evidence that he poses a risk of flight?

MS. WANNARKA: The risk of flight is, for one, very much tied to the dangerousness, which is that whole encounter of fight -- he -- other than pulling over, he resisted and fought those officers from the beginning when they were able to get him out of the vehicle and then he continued fighting

on the ground. As he is using his vehicle, he is trying to evade and trying to get away. And so he's clearly trying to avoid apprehension consequence. He is here illegally. That is no small thing.

THE COURT: But you can't use that as the basis of denial under the Bail Reform Act.

MS. WANNARKA: I believe it's part of the picture, though. It's not just it's not the only thing. It's that he -- his actions were -- are consistent with someone who is trying to get away from law enforcement, who is trying to evade and avoid the consequences.

THE COURT: So that's the risk of flight.

MS. WANNARKA: Yes, Your Honor.

THE COURT: And then what else do you have? Now, so the risk of flight, you have to prove that by a preponderance of the evidence. You are only using the allegations in this case that he poses a flight risk and the fact that he is not here with -- he's not here without -- or permission of the United States to be here.

MS. WANNARKA: That's right, Your Honor.

THE COURT: Now, the dangerousness you have to prove by clear and convincing evidence, so how do you get there?

MS. WANNARKA: Well, we know now that there are the allegations of domestic violence and -- as well, again, the encounter was extremely dangerous. It was extremely

dangerous. And I believe that that is -- that is important, because it caused injury. It caused injury to himself. It caused injury to a federal agent. And the whole nature of what happened was extremely violent, and that is why we believe there's a dangerousness.

THE COURT: Thank you.

MS. WANNARKA: Thank you, Judge.

THE COURT: Let me hear from the defendant.

MS. DOUENAT: What would you like to hear from me? I mean, first of all, Your Honor, I would agree -- I think there is no corroborating evidence to the tip. So we -- there's a tip from a woman in Alpine who says there's domestic violence and there is a stalking, but there is no criminal history. Mr. Jaime Alberto Quintanilla Chavez has no criminal history whatsoever. He has no ICE encounters and no history with being in court for any domestic violence issue, for any stalking issues, none of that matter.

In fact, the testimony at the initial bond hearing was that he is a very peaceful man who just goes to work and plays soccer and comes home; that he does have a long-term relationship with a girlfriend who now is his fiancee, who has been on and off with for the span of 12 years.

THE COURT: Is she a United States citizen?

MS. DOUENAT: She is a United States citizen, Your Honor. And she's here. Her mother is here as well. His

employer is here. And the woman that helped him prepare his taxes is here. Then we also have another witness today for the Court, the woman who actually showed up at the scene to pick up his dog. He had a little weenie dog in the car. He was really concerned about his dog and having his dog taken care of. She showed up at the scene. She would be testifying to the fact that her husband was on the phone with him while this was happening and that her husband saw men pointing guns at him, and he was on his way to work.

THE COURT: This is the first I am hearing of this. They had already unholstered weapons?

MS. DOUENAT: So -- so, yes, we didn't know that at the time of the bond hearing. We then interviewed other witnesses since that bond hearing, Your Honor. And, yes, he was on the phone, and he was on the phone with his friend Pedro. His wife Delfida is here to testify about how Pedro, who is a legal permanent resident, was on his way to work and called her to go pick up the truck and the dog, because he was concerned that Jaime was being picked up.

She has known him for also twelve years and knows him to be a very law-abiding individual, has known Tatiana during the same time because she started dating her husband, who now she's married to and has two children from, at the same time that Tatiana was dating Jaime. She also knows that he's been working and been paying his taxes since 2012.

So he has been paying his taxes since 2012, every year. We were going to offer the taxes at the bond hearing, but the Court believed the witness, and did -- I didn't want to have to submit all of those under seal, because they are just private information, Your Honor. But we do have them if the Court wants them.

THE COURT: No, I'll take your representation that you have seen them and that they are filed tax returns that he paid.

MS. DOUENAT: They are. But as far as -- I mean, if they had checked the credibility of that tip, they would have noticed -- and if they had found out who this woman's daughter was and checked her record, she has a record for trespassing on Benrus, because she broke into Mr. Jaime -- Mr. Quintanilla Chavez's home.

THE COURT: Now, I'm confused. How many women are there in this matter --

MS. DOUENAT: So the woman --

THE COURT: -- and who is who?

MS. DOUENAT: -- the woman who gave the tip -- which we just found out yesterday, because we just got this tip yesterday -- was -- so the tip was given in from the Alpine office to the San Antonio office. So somebody in Alpine calls the Alpine HS line and says, "This man is dating -- was dating my daughter and is stalking my daughter and abusing my

daughter, and he's illegally here" --

THE COURT: On Benrus -- he's not living with that woman. He's living with another woman?

MS. DOUENAT: He's not living with another woman. He's dating another woman.

THE COURT: Okay.

MS. DOUENAT: And he lives with somebody else, but not a woman.

THE COURT: Okay. He's not -- he's not living with the daughter of the woman who gave this tip?

MS. DOUENAT: No, not at all. She broke into his home and made a mess in the home, and we have pictures of the mess. And we -- there was a SAPD report filed against her, and there's a charge for trespass against her.

There is also -- she also has a felony for injuring an elderly person, and she also has a DWI. But that is the daughter who allegedly is being stalked and domestic violence.

THE COURT: So let's set that aside for later when we argue --

MS. DOUENAT: Right. It is for later.

THE COURT: -- about the indictment being defective now.

MS. DOUENAT: But as far as any credibility on whether he was here illegally, I mean, there is no -- there was no A-File. There was no encounters with immigration.

There was no encounters with SAPD for domestic violence. There is no criminal history at all. So they couldn't -- actually, there was nothing believable about what she said about the fact that he was stalking, that he was doing domestic violence or that he was here illegally.

I mean, they are saying that because there is no record, then he must be here illegally. So they are assuming that if a person has no record, they are here illegally. That's not proof. That's not -- that's not so.

Then we have a problem with five agencies, mainly all federal, except for DPS, showing up to surveil a house without probable cause, without any suspicion of anything. And then what they observe is a man get into his work truck and leaving for work.

THE COURT: And so --

MS. DOUENAT: Again, that's not --

THE COURT: -- when we get to the motion to dismiss the indictment, I want you to brief whether or not federal law enforcement officers can make traffic vehicle stops.

MS. DOUENAT: Absolutely, Your Honor.

THE COURT: Go ahead.

MS. DOUENAT: And -- we will brief that. And so they do make a stop, which they don't -- so what we -- we do have a video now from DPS --

THE COURT: There's a video of this incident?

MS. DOUENAT: There's an incident -- so, yes. It's not the actual stop itself, but we have DPS who -- they both are wearing bodycam footage, and they are wearing plainclothes, but they have bodycams, and you see -- right shortly after he's been stopped, you see where the vehicle was. You see -- at that point, you see just the officer yelling *"abre la puerta, abre la puerta,"* you know, "Just get out," or "open the door and get out." And then you see the other officer saying, "If you don't open the door, we're going to break your window." And then they go get a tool to break the window.

Then the window -- within a second, window gets broken. The vehicle moves forward. Yes, there's -- DPS had parked in front, was already parked in front, because they are videotaping this whole thing in the middle of the street to block any kind of traffic. The vehicle pretty much stops, and then does back up, and then you see the Camaro being -- all these vehicles, by the way, are undercover. Like, in other words, they are not -- they don't say "ICE." They don't say "Police." Even DHS has trucks that are not marked "DPS."

There is -- the one officer who is speaking to him in Spanish is wearing a vest, and it has, you know, one of those things that you pull on, and pull up on, it says "Police" on there. So there is a thing that says "Police," but that's it. I mean, there's no -- and there is -- everybody else is

wearing plainclothes.

THE COURT: Okay. So let me argue -- when you argue the motion to dismiss the indictment, I mean, how am I going to get around that there may be fact issues as to your client's behavior?

So you don't need to address this now. I'm just posing the questions that I know are going to need to have answers when we have this motion to dismiss the indictment hearing.

Okay. So I've got your take on that. I would like to see the video at the subsequent hearing, and -- so let's prepare to see that.

MS. WANNARKA: I'm sorry. Your Honor, we have it here today if you would like to see it. It's about twelve and a half minutes long.

THE COURT: So what I'm going to do today, in light of the withdrawal of the motion to dismiss the complaint, I'm going to let you-all tee up a motion to dismiss the indictment and get the government's response and have a separate hearing on this, because I think procedurally that's how I've got to proceed.

So let's go forward now on, though, what is properly before me and basically --

MS. DOUENAT: Yes, Your Honor.

THE COURT: -- a de novo --

MS. DOUENAT: Right.

THE COURT: -- appeal of the magistrate judge's release order.

MS. DOUENAT: So for me, I have witnesses, Your Honor, ready to testify about the fact that he's not a flight risk or a danger to the community, and I can call them to the stand.

THE COURT: Go ahead.

MS. DOUENAT: So, Your Honor, we would call -- our first witness would be -- and, Your Honor, Delfida Acosta, we're calling her. I know she's going to be talking about what she observed when she arrived at the scene. And mainly it's -- and also her -- his character, Jaime's character, but it's because of the weight of the evidence, the Court can consider that in giving a bond --

THE COURT: That's fine.

MS. DOUENAT: -- as well.

THE COURT: Let me caution you against bringing up his employer, because in this day and age now, the fact that the employer may have employed someone allegedly without authorization --

MS. DOUENAT: I understand.

THE COURT: -- may get that person in trouble as, you know, violating the immigration laws.

MS. DOUENAT: Very true, Your Honor.

THE COURT: Just fair warning to that.

MS. DOUENAT: So I'll just have the Court rely on the transcript that was -- of the hearing previously.

THE COURT: And I read that.

MS. DOUENAT: And we're going to be calling Delfida Acosta to the stand. She is an English speaker.

(DELFIDA ACOSTA, having been duly sworn, testified as follows:)

DIRECT EXAMINATION

BY MS. DOUENAT:

Q. Okay. Good afternoon.

A. Good afternoon.

Q. Could you please state your name for the record, and if you could say how to -- how it's written.

A. Yes. My name is Delfida Patricia Acosta, and you spell out Delfida as D-E-L-F-I-D-A.

Q. And Ms. Delfida Acosta, are you a U.S. citizen?

A. Yes, I am.

Q. And can you please tell us how you know Jaime.

A. I know Jaime because he's my husband's very, very close friend.

Q. And tell me a little bit about your husband -- what's your husband's name?

A. His name is Pedro Mejia [phonetic].

Q. Okay. And y'all are married?

A. Yes, we are.
Q. How long have you been married?
A. We've been married for eight and a half years.
Q. And how long have y'all been dating?
A. For eleven -- ten and a half years.
Q. And when did you meet Jaime?
A. I met him in 2014.
Q. So about 11 years?
A. Yes, 2014, 2015.
Q. And where did you meet him initially?
A. He was living with my husband before we started dating, so that's how I know of him.
Q. In fact, where were they living when you met him?
A. In some apartments off Military.
Q. And so let me ask you this: Do you know whether -- so you mentioned that your husband knows him, so let me ask, how long has your husband known Jaime?
A. Since childhood. They are from the same hometown, so they have known each other since childhood.
Q. From Honduras?
A. Yes, from Honduras.
Q. Is your husband, is he -- does he have status?
A. Yes, he does.
Q. What is he?
A. He's a lawful permanent resident.

Q. How many children do y'all have?
A. We have two.
Q. So you met Jaime at ten and a half years ago. Could you describe your relationship with him. Just yours.
A. It's always been respectful. I -- he actually lived with my husband and I for a time, and he was always respectful, very kind. I had my baby when he lived with him -- when we lived with him, and he was also a very nice person, a very kind. That's all I have to say. Very good person, kind, respectful.
Q. Do your children know him?
A. Yes, they do.
Q. Do you trust your children with him?
A. I do.
Q. What kind of relationship does he have with law enforcement that you know of?
A. He's never been involved in -- that's why I was so surprised when I heard this.
Q. Were you -- did you -- on June 20th, did you come to be present at the scene of this stop?
A. Yes, I did.
Q. And how did that happen?
A. I was on my way to work, 7:30 -- around 7:30, and my husband gives me a call, and he tells me they have stopped Jaime, and he told me it was immigration. And he told me,

"Can you please go and see if you can get his truck and his dog." So I turned around. I was about to get on the highway. I turned around, and I went to the scene. I was about a couple of blocks, because it was right by my house that they stopped him.
Q. So you live near -- I guess it's Consuelo where they stopped him?
A. Yes. I live on Alicia, and they stopped him at Consuelo. It's like two streets, three streets down.
Q. And so your husband was already on his way to work or was already at work?
A. Yes, my husband was already on his way to work. He works in New Braunfels, so it was impossible for him to get there in time. That's why he called me.
Q. But your husband was on the phone with him when this happened?
A. Yes. He -- so the way my husband knew is because Jaime called him on a Messenger video call, and my husband saw what was going on. He told me that Jaime had him on video and that he saw them pointing the gun at him and yelling at him.
Q. When you arrived at the scene, what did you observe?
A. So when I arrived, Jaime was already in the -- in an SUV, a black SUV. He was already handcuffed, and I approached the ICE officer, and I asked him, "Why are you arresting him?" And he told me, "Because he's illegal in the country, ma'am,"

and I was like, "Am I able to take his truck?" And they told me, "Go talk to DHS." I go over to DHS, and I asked him, "Why are you arresting him?" And they said, "He has a warrant, ma'am." I asked, "Why?" They said, "Are you going to get the dog? Yes or no? If not, leave."

Q. So you said you first talked to an ICE officer?

A. Yes.

Q. How do you know he's an ICE officer?

A. He had a little patch right here that said "ICE."

Q. And how was he dressed otherwise?

A. It was just a vest like you mentioned, a vest, and then it was normal dressing. It wasn't like a -- I didn't see any lights. No cops, nothing. Just -- it seemed, to me, normal people.

Q. So you are saying nobody was in uniform?

A. No.

Q. And the cars were?

A. Regular cars.

Q. They weren't with signage, right?

A. No, they weren't.

Q. Okay. How many officers were there?

A. There were about anywhere from five to seven.

Q. And did you get to talk to Jaime or see Jaime?

A. Yes, I was --

Q. I'm sorry, go ahead.

A. I did -- the window was down from the police unit, so I was able to see him from when I -- as soon as I got there, and he asked me if I could have them -- I guess he wanted me to translate or ask him if they could loosen up his handcuffs because they were super tight, and I told him, and they were like, "No, we're not going to do that."

And then I also noticed that his face had, like, if someone had hurt him, and it had scrapes, and his -- his face was scraped all around his eye.

Q. How did that make you feel when the agents said no about the handcuffs and not being able to take the car? How did that make you feel about the agents' demeanor?

A. One of them was very rude, and I believe he was the one in the Camaro, the one driving the Camaro. He was the one who asked me to leave. And then when I was -- after I got the dog and I was walking out, I saw him in the car very upset. It saddened me a lot, because I know -- I have a lot of affection for Jaime. I've known him for so many years. He's always welcome at my house. My husband and him see soccer teams every now and then, so it really saddened me to see the whole situation and to see him hurt, to see his scared face, and they just -- they didn't even give me a good, you know, sensation since they seemed upset.

Q. And let me ask you this. I know we talked to your husband, and we also asked him to come here. Why is your

husband not here?
A. At the moment, I work for an immigration attorney, and I was given advice for him not to come. He's a lawful permanent resident. And honestly, at this day and time, we're scared that, you know, they can go and -- against him or something.
Q. So it's because of fear that --
A. Yes.
Q. -- they would do something wrong?
A. Definitely.
Q. And you were advised that by your immigration lawyer that you work for?
A. Yes.
Q. Who do you work for?
A. The law office of Christina Neville.
Q. How long have you worked there?
A. Since 2017.
Q. Is there anything else you would like to say regarding Jaime's character?
A. No, just that he's a good person.
Q. Has he ever left this country since 2012?
A. Never.
Q. So he basically has lived in the United States since 2012?
A. Yes, he has.
Q. And is he employed?
A. Yes. He's a very hard worker. That's how I know of him.

I know that he works. He goes home. He is not an alcoholic. He doesn't -- I've never even seen him drink. He's a very calm person. We have a lot of friends in common, and nobody has ever said anything bad about him. It's always good stuff. He minds his business. He's calm. He's at home. He doesn't go out and is -- like, I wouldn't be standing here, honestly, if I knew he was someone that was in a risk to the community because that would even put my own family at risk.
Q. So let's talk also about the dog that you picked up. What kind of dog is it?
A. It's a weenie dog. It's small.
Q. And how long has he had this dog?
A. I know for a long time, because he would take him everywhere, and they would say that nobody would give him the treat that he would give him, because he would take him to work, take him everywhere. He would go and take care of him.
Q. So -- and you took in the dog, right?
A. Yes, I did.
Q. And what's the dog's name?
A. Rocky.
Q. All right. Thank you.
THE COURT: Any cross?
MS. WANNARKA: I don't have any questions, Your Honor.
THE COURT: Thank you, ma'am.

Any other witness?

MS. DOUENAT: Your Honor, I mean, I don't want to regurgitate what was already testified --

THE COURT: I'll take into account the previous.

MS. DOUENAT: Yes, please, thank you.

So Tatiana is here, and she would be saying -- again, she's his fiancée. The only difference -- and I guess -- and we could -- she did hire an immigration lawyer. So she now has an immigration lawyer that she hired yesterday to represent him in immigration court for a bond.

THE COURT: Thank you. So the Court finds that the government has not proved by clear and convincing evidence that the defendant poses a danger to any other person or the community at large, so that fails.

Do you want to argue anything more on your flight risk?

MS. WANNARKA: No, Your Honor.

THE COURT: Yeah, the Court finds that the government has failed to prove by a preponderance of the evidence that the defendant, if released, presented an actual risk of flight.

So now even assuming, in the alternative, that you had done so, the government still has to establish by a preponderance of the evidence that no condition or combination of conditions could be imposed which would reasonably assure

the defendant's presence in court. And so, you know, you haven't met that burden either.

So I think the next step here in this case is I'm going to remand this to the magistrate judge for the imposition of terms of bond, because that was never done in the first instance. Is that correct?

MS. DOUENAT: That's correct, Your Honor.

THE COURT: Yeah. So defendant is remanded to the magistrate judge for bond conditions. Then I'll wait to see if and when a motion-to-dismiss indictment is filed. Then I'll hear a hearing on that.

Now, that said, you know, I want to place Mr. Fuentes -- Agent Fuentes, you and the rest of your department on notice. I can't overemphasize enough how much -- when FBI agents and everybody else comes to us and we read those affidavits, we rely on those affidavits. And you made at least three mistakes.

One, you misrepresented -- and for now I will give you the benefit of the doubt. If at time of trial, though, it turns out that the testimony turns out that this goes beyond just misrepresentation or errors and it was flat-out deliberate, intentional misrepresentations, I reserve the right to hold you in contempt at a later point in time. But even if I -- you know, at this point just attribute this to mere error, I know you weren't at the scene, and you were

gathering all this. But even agents who were gathering all this data to submit by way of an affidavit, you're still swearing to the veracity of the underlying data.

Here, you made a mistake. You said there was an order of removal. There was no order of removal. Two, you failed to disclose now this tip that supposedly led you over here, and you failed to identify for the magistrate judge that it was an uncorroborated tip.

And then, three, you led the magistrate judge and me, in reading this affidavit, that the reason for the stop of the vehicle was license plate suspension. And now the government is arguing it wasn't license plate suspension, that the probable cause for the stopping of the vehicle was the belief that the defendant was undocumented. So you made at least three errors in the affidavit.

I'm not going to tolerate any mistakes from either you or your office in the future. Is that is absolutely clear?

SPECIAL AGENT FUENTES: Yes, Your Honor.

THE COURT: I'll wait for any future motions.

*(Concludes proceedings)*

-o0o-

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Date: 07/11/25

/s/ Gigi Simcox
United States Court Reporter
262 West Nueva Street
San Antonio TX 78207
Telephone: (210)244-5037