IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

UNITED STATES OF AMERICA, .
.
.
vs. . DOCKET NO. 5:25-CR-388-XR
.
JAIME ALBERTO QUINTANILLA .
CHAVEZ, .
.
DEFENDANT. .

TRANSCRIPT OF MOTION TO DISMISS/MOTION TO SUPPRESS
BEFORE THE HONORABLE XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE
AUGUST 25, 2025

APPEARANCES:

FOR THE PLAINTIFF: SARAH WANNARKA, ESQUIRE
UNITED STATES ATTORNEY'S OFFICE
601 N.W. LOOP 410, SUITE 600
SAN ANTONIO TX 78216

FOR THE DEFENDANT: MARINA DOUENAT, ESQUIRE
FEDERAL PUBLIC DEFENDER'S OFFICE
727 E. CESAR E. CHAVEZ BOULEVARD
SUITE B-207
SAN ANTONIO TX 78206

REPORTED BY: GIGI SIMCOX, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
SAN ANTONIO, TEXAS

# INDEX

HECTOR HERNANDEZ
Direct Examination By Ms. Wannarka 4
Cross-Examination By Ms. Douenat 41
Examination The Court 64
Cross-Examination By Ms. Douenat 67
Redirect Examination By Ms. Wannarka 69
Recross-Examination By Ms. Douenat 70

WILLIAM CARL
Direct Examination By Ms. Wannarka 73
Cross-Examination By Ms. Douenat 86
Redirect Examination By Ms. Wannarka 91

HECTOR HERNANDEZ
Direct Examination By Ms. Douenat 94

*(San Antonio, Texas; August 25, 2025, at 1:30 p.m., in open court.)*

THE COURT: 25CR388, United States versus Jaime Quintanilla Chavez.

Appearances, please.

MS. WANNARKA: Sarah Wannarka for the United States. Good afternoon.

MS. DOUENAT: Good afternoon, Your Honor. Marina Douenat on behalf of Mr. Quintanilla Chavez.

THE COURT: Thank you.

We're here on two motions filed by the defendant, a motion to dismiss and a motion to suppress and dismiss, Dockets 37 and 38. How do y'all want to proceed?

MS. WANNARKA: The government is okay with going first, calling Officer Hernandez, and then Ms. Douenat can be on cross.

THE COURT: Is that okay?

MS. DOUENAT: Yes, Your Honor.

THE COURT: Go ahead.

MS. WANNARKA: Your Honor, the government calls ERO Deportation Officer Hector Hernandez to the stand.

(HECTOR HERNANDEZ, having been duly sworn, testified as follows:)

DIRECT EXAMINATION

BY MS. WANNARKA:

Q. Please tell the Court your name.

A. Hector Hernandez.

Q. How are you employed?

A. I'm a deportation officer for Immigration and Customs Enforcement.

Q. How long have you done that work?

A. I've been employed with them since September of 2015.

Q. Prior to that, what did you do?

A. I was a Border Patrol agent for the United States Border Patrol.

Q. We are here today in court on a case on Jaime Alberto Quintanilla Chavez. Are you familiar with this case?

A. Yes.

Q. Were you the team lead in the immigration operation that led to Quintanilla Chavez's arrest?

A. Yes.

Q. How did you first learn about Jaime Alberto Quintanilla Chavez?

A. I received an email from an HSI agent that originated -- it was an HSI tip that originated in Alpine, Texas.

Q. What day did you receive that tip?

A. I believe it was June 14th, 2025.

Q. All right. So you received a tip from HSI in Alpine?

A. It originated from HSI Alpine.
Q. All right. What is an HSI tip?
A. It's where citizens or people report in. They could just call a certain number and they make reports and then we receive it and look into it.
Q. What did this tip say?
A. It came from a female. It stated -- it provided -- she provided her name, I believe, phone number. She stated that the defendant Jaime Alberto or Jaime Quintanilla Chavez was illegally present in the United States.
Q. This female who made the tip, did she also provide her date of birth?
A. Yes.
Q. And when she made the report about this defendant, did she give his full name?
A. Yes. She provided his full name, date of birth, and a phone number.
Q. And did she also indicate where he lives?
A. Yes. She provided an address off of Belrus.
THE COURT: Benrus.
THE WITNESS: Benrus. Sorry.
BY MS. WANNARKA:
Q. Benrus Boulevard?
A. Benrus Boulevard, yes.
Q. Is that in San Antonio, Texas?

A. Yes. San Antonio, Texas.
Q. Did she also say anything about the defendant and his relationship -- alleged relationship with her daughter?
A. She did say that -- I can't recall the exact email but he had abused her and was stalking I believe.
Q. Some allegations of domestic violence?
A. Yes. Some allegations, yes.
Q. Okay. That's not what you are here to talk about today, is it?
A. No.
Q. Did you do any further investigation of those allegations that were in the tip?
A. No.
Q. Did the tip also have some attachments?
A. Yes.
Q. What were they?
A. One attachment was a photo of his ID, his Honduran ID.
Q. Okay.
A. There was two photos of two different vehicles. And then there was like ACRIMe reports of different research that the HSI agent in Alpine had conducted.
Q. Have you seen recently a photo of that ID marked Government's Exhibit 3?
A. Yes.
Q. Is that the picture that was -- is that what was attached

to the HSI tip?
A. Yes.
MS. WANNARKA: Your Honor, the government at this time offers Government's Exhibit 3, if we can produce it now, please, into evidence just for purposes of this hearing.
MS. DOUENAT: No objection.
THE COURT: 3 is admitted.
*(Government's Exhibit 3 received into evidence)*
BY MS. WANNARKA:
Q. Is this the ID, Officer Hernandez?
A. Yes.
THE COURT: Now, just to be clear, did the mother of this woman give you this, or you got this somehow else?
THE WITNESS: This was provided in the tip that originated from Alpine, Texas. It was provided in the email.
THE COURT: So this is coming from Noel Vidal?
THE WITNESS: He forwarded an email from the agent in Alpine.
THE COURT: I'm still confused. Is this information ICE developed, or is this information that the tip -- the lady, the tipster gave you-all? Or you don't know?
THE WITNESS: I don't know. I just -- it was included in the email when it was sent to me.
BY MS. WANNARKA:
Q. Okay. All right. So then this ID, what is the name on

it?
A. Jaime Alberto Quintanilla Chavez.
Q. It's kind of hard to see right now, but does it also indicate where this person was born?
A. Yes.
Q. What does it say?
A. It says "*Hondureño de nacimiento*."
Q. What does that mean?
A. It means Honduran by birth.
Q. Does it also include the defendant's date of birth?
A. It's hard to see, but I believe so, yes.
Yes. It's on the next line.
Q. All right. And is that consistent with the defendant in this courtroom's date of birth?
A. Yes.
MS. WANNARKA: I wonder if it would make sense --
Your Honor, if I may confer with opposing counsel.
MS. DOUENAT: Do you want to produce it?
MS. WANNARKA: Yeah.
MS. DOUENAT: You're welcome. Please. I mean, I'll use it eventually.
MS. WANNARKA: We're going to mark as Government's Exhibit 4 the actual tip that came in. That may, at this point, just help --
THE COURT: Well, are you including all three pages

because you gave it to me earlier.

MS. WANNARKA: Yes, Your Honor.

THE COURT: Because I want the information saying "Got this info from a colleague in Alpine, Texas. Would be an easy target for the weekend."

MS. WANNARKA: Yes, Your Honor.

THE COURT: So that's coming in?

MS. WANNARKA: Yes, Your Honor, marked Government's Exhibit 4.

MS. DOUENAT: Yes.

*(Government's Exhibit 4 received into evidence)*

BY MS. WANNARKA:

Q. I'm just going to hand this to the agent.

Officer Hernandez, I just handed you Government's Exhibit 4. What is that?

A. This is the email string from where I received the tip, and then I forwarded it to Special Agent Fuentes.

Q. And the initiating part of that email, is that the information from the female about the defendant?

A. Yes.

Q. And it contains all of the information you have just testified to, name, date of birth, vehicles?

A. Yes.

Q. Okay. After you received that tip along with the attachments, did you do your own research?

A. Yes.
Q. Did you reference a database called UPAX?
A. Yes.
Q. What is UPAX?
THE COURT: Can you give us that acronym?
MS. WANNARKA: U-P-A-X.
BY MS. WANNARKA:
Q. What is UPAX?
A. So it's called Unified Passenger. It's a Customs and Border protection database that we utilize frequently to -- it runs checks on a vast majority of different databases.
Q. Do you rely on this regularly in your job?
A. Yes.
Q. What types of databases does this Unified Passenger database include?
A. It includes derogatory, such as like NCIC wanted warrants, criminal history. It checks applications for travel. And I can't recall the third one, but it checks for --
Q. Does it include border crossings?
A. Yes. Border crossings, I-94s.
Q. And what is an I-94?
A. It's a permission to enter the United States.
Q. A nonimmigrant Visa?
A. Yes.
Q. If there are any hits on Interpol, would that show there?

A. I believe so, yes.
Q. Any criminal history or I think you had said "wanted warrants?"
A. Wanted warrants. It checks like applications for travel, if they apply for any admissions, any Visas.
Q. Does it include any immigration contacts, if the defendant has any sort of official immigration contact, an I-213 generated, would it include that?
A. Yes.
Q. If the defendant who does not have legal status had some sort of temporary basis to be in the United States, would it have been reflected in this database?
A. Yes.
Q. Did you search the defendant's name in this database?
A. I searched his name -- name, date of birth and country of birth as it appeared on the ID.
Q. And did you find anything on him allowing him to be present in the United States?
A. No.
Q. As well, you didn't find any criminal history on him?
A. Correct.
Q. You found nothing?
A. Nothing.
Q. Did you also search another database called Person Centric Query Service?

A. Yes.
Q. What is that?
A. That's a database utilized by USCIS, United States Citizenship Immigration Services.
Q. And what type of information would that have?
A. It would have any asylum applications, any adjustment status.
Q. Any permission to be in the United States?
A. And permission to be -- any work authorization cards, such as those.
Q. Did you find the defendant and his date of birth in this database?
A. No.
THE COURT: Would it include people who are naturalized?
THE WITNESS: Yes.
BY MS. WANNARKA:
Q. Did you conduct additional research on the tip? Did you contact the lady in the tip?
A. Oh, yes.
Q. Tell the Court about that, please.
A. I called her just to see if she had any additional information and to confirm the address. She stated that he lived at the address that was provided and she also provided that he drove a different vehicle, a white truck.

THE COURT: When did you make that call?

THE WITNESS: I don't recall the exact date.

THE COURT: You don't have any file with you?

THE WITNESS: Not on the call, no, Your Honor.

THE COURT: Is it before or after Noel Vidal said, this is an "easy target?"

THE WITNESS: It was after I received the tip.

BY MS. WANNARKA:

Q. You made the call after you received that email string but before you approached the defendant?

A. Yes.

Q. Why did you call the female?

A. Just to clarify the information, just to see if she had any additional information.

Q. And you did learn about the white truck being new?

A. Yes.

Q. Was the defendant arrested in a white truck?

A. Yes.

Q. Did you also conduct surveillance?

A. Yes.

Q. How many times did you conduct surveillance?

A. Before the date of operation, about two times.

Q. When you conducted surveillance, what did you see?

A. We observed the Honda -- a Honda, and then the white truck. And there was another vehicle there that belonged to a

different person.
Q. Was a Honda mentioned or in one of the pictures that was attached to the tip?
A. Yes.
Q. Did DPS also conduct surveillance?
A. Yes.
Q. Did they observe the same?
A. Yes.
Q. By the way, going back to the databases, the defendant was not in any of the immigration databases, is that what you testified to?
A. Correct.
Q. Subsequent to his arrest, however, when you entered the same information into the databases, is he now in the database?
A. Yes.
Q. Because he's been encountered by immigration officials?
A. Yes.
THE COURT: Was there anything about a report to the police about this alleged domestic violence?
THE WITNESS: In the database or from the tip?
THE COURT: When you did your searches.
THE WITNESS: No.
BY MS. WANNARKA:
Q. And did you do any more investigation of the domestic

violence allegation?
A. No.
Q. Why is that?
A. I don't look into domestic violence allegations.
Q. Were you primarily concerned with his alien status?
A. Yes.
Q. Did you decide then to make him the target of an immigration operation?
A. Yes.
Q. For a little bit of background, we've all heard there's been an increase of immigration operations. Specifically here in San Antonio, how does that work? How are groups of agents paired together to conduct these operations?
A. So I'm part of a -- it's called a Fugitive Operations Team, and so the day before we receive an email from our supervisors with the assigned -- the team lead, and then the support, supporting officers. We utilize the special agents from HSI and then the special agents from the Texas Department of Public Safety.
THE COURT: But he's not a fugitive, so how did you get involved?
THE WITNESS: That's just the name of the team.
THE COURT: Everybody is a fugitive?
THE WITNESS: No.

BY MS. WANNARKA:
Q. It's the name of the team you're assigned to?
A. Yes.
Q. Do you necessarily only look for fugitives?
A. No.
Q. What are you looking for?
A. Anyone illegally present in the United States.
Q. For this operation with this defendant, were you designated as the team lead?
A. Yes.
Q. Is that because you developed this tip with your research?
A. Yes.
Q. Who else was assigned to this defendant's team?
A. It was Special Agent William Carl.
Q. William Carl with HSI?
A. HSI, yes.
Q. Okay.
A. And then it was two special agents from DPS, I believe Fred Medina and Ross Rigsby. And I can't recall the other guy's name, Brian -- I can't remember his last name.
Q. That's okay. Do you -- does your job -- let me back up.
How often do you engage in these enforcement operations?
A. Daily.
Q. And for those operations like you just said, you get the assignment the night before?

A. Yes.
Q. How many agents are typically assigned to one defendant?
A. The teams can fluctuate from four to six, six total, within the three agencies.
Q. Has it been as few as two?
A. Yes.
Q. But generally you're saying four to six agents are assigned as a rule for every single defendant?
A. Yes.
Q. So let's move now to the day of the defendant's apprehension. What was that day?
A. It was June 20th, 2025.
Q. All right. So then describe for the Court what you did that morning, how you set up, who was where.
A. Special Agent Carl and I were in our separate vehicles and we set up closer to the residence. I had what you call the "eye," where I watch the door to identify the target.
Q. Did you use binoculars to do that?
A. Yes.
Q. And what were you looking for, being the eye?
A. I'm looking for the defendant when he comes out to identify that that's him.
Q. Where is everybody else parked?
A. Special Agent Carl's down the road I believe there on Benrus, and the special agents from DPS are within blocks on

the outside.
Q. Are DPS -- do DPS have the same roles as you do and Agent Carl in these operations?
A. They are mainly used for surveillance and then as support.
Q. Okay. So then that morning you are sitting, you are watching the house, about what time is it?
A. We usually arrive at the house before 6:00 a.m.
Q. Was it dark?
A. Yes.
Q. When you saw the defendant, had it become light?
A. Yes, it was after sunrise.
Q. All right. Okay. So tell the Court about how you saw the defendant.
A. I saw the defendant come out of his front porch. He sat on the -- in the front porch and put on his work boots. And then sometime later he got into his work truck -- or into the white truck and drove off.
Q. The white truck, did it have a trailer attached to it?
A. Yes.
Q. How would you describe that trailer?
A. It's a work trailer. It was a big trailer. I believe it had equipment on there.
Q. How did you identify the individual coming out of the house as the defendant?
A. Well, I utilized my binoculars. I matched him. He

matched the identity of the photo that I had received.
Q. In fact, had somebody else come out of the house and you recognized it was not the defendant?
A. Yes.
Q. When you identified the defendant as the person that you were looking for that morning, did you call out over the radio?
THE COURT: Let me stop there.
So the tip that you got from this woman identified two people who were supposedly illegally living in there. Why did you discount that other person and only follow this one?
THE WITNESS: This is the photo that I had.
THE COURT: But she gave you two living at the same house.
THE WITNESS: Yes. I didn't have a photo of the other one.
THE COURT: You have a photo of the other one?
What I'm asking you is: Why did you go after this defendant when the tip gave you two names living at the same address and you are seeing two people at that address?
THE WITNESS: The other one that left, I don't believe it was the other person. I went after him because he's the ID that I had to verify that it was him.
THE COURT: So you didn't even look for an ID of the second person?

THE WITNESS: I don't understand.

THE COURT: Yeah. I'm sure you don't.

BY MS. WANNARKA:

Q. Did you have a name for the second person?

A. I believe in the tip line she included another name.

Q. Did you have a date of birth?

A. No. It just states his name, so I didn't have a date of birth.

THE COURT: Continue.

BY MS. WANNARKA:

Q. Okay. So then the -- when you saw the defendant, did you call out over the radio?

A. Yes.

Q. What did you say?

A. I just -- I don't recall the exact verbiage, but it was he's -- I identified him, and then that he got in his vehicle and was driving off in a direction of travel.

Q. All right. So what happened at that point, did Agent Carl pull in behind him?

A. Yes. Agent Carl pulled in behind him and I proceeded behind Agent Carl.

Q. All right. So when the defendant pulled out of his house, did he drive a little bit of a distance before you activated your lights?

A. Yes.

Q. About how far, a street, two, three?
A. Maybe half a mile.
Q. Agent Carl was right behind the defendant?
A. Yes.
Q. And you were right behind Agent Carl?
A. Yes.
Q. So you both activated your lights?
A. Yes.
Q. Do you drive an unmarked vehicle?
A. Yes.
Q. And does Agent Carl drive an unmarked vehicle?
A. Yes.
Q. Are they your government issued vehicles?
A. Yes.
Q. Are they equipped with lights, red and green flashing police lights?
A. The red -- yes.
Q. Did I say "green?"
A. Yeah.
Q. It's not Christmas. Red and blue. I'm sorry.
A. Red and blue, yes.
Q. When you activated the emergency lights, did the defendant pull over?
A. Yes.
Q. Did he evade at that time in any way?

A. No.
Q. After he pulled over, did you approach the truck?
A. Yes.
Q. Which side did you approach?
A. I approached the driver's side.
Q. And which side did Agent Carl approach?
A. The passenger side.
Q. What were you wearing?
A. I was wearing my green bulletproof vest with my accessories on there.
Q. Did it say "police" across your chest?
A. Yes, it said police and I had my ICE badge on the left shoulder.
Q. Did you also have on your vest a hand-held radio, flashlight, handcuff key, and a pouch with your handcuffs?
A. Yes.
Q. All right. When you approached the driver's side door, what did you do?
A. Announced my presence.
Q. Did you identify yourself?
A. Identified myself, yes.
Q. Did you identify yourself as law enforcement?
A. I identified myself as I believe Officer Hernandez with immigration.
Q. Did you give the defendant a command?

A. Yes.
Q. What did you ask him to do?
A. I asked him to turn off the vehicle, roll down the window, and I asked him for his ID.
Q. Did he turn off his vehicle?
A. No.
Q. Did he roll down his window?
A. No.
Q. Did he at that point yet show you his ID?
A. At that first point, no.
Q. What did he do?
A. He immediately got on his phone. I saw him open up his phone and started dialing, trying to call somebody.
Q. Did that alert you?
A. Yes.
Q. Why?
A. Well, he wasn't following commands, and with the proximity to his house I don't know who he's calling.
Q. Why were you fearful of who he may be calling so close to his house?
A. I mean, with the media attention and --
THE COURT: I just thought of something.
Did he get sworn in?
MS. WANNARKA: Yes.
THE COURT: Careful what you say.

THE WITNESS: Yes, sir.
BY MS. WANNARKA:
Q. Why were you alerted with him being on his phone?
A. Because he could just be calling for someone to come help him out.
Q. From his -- because his house was so close?
A. Yes.
Q. Did you continue to give the defendant commands?
A. Yes, I did.
Q. Were they in Spanish?
A. I did English and Spanish.
Q. And at some point did you call his name out and say, "Show me your ID?"
A. Yes.
Q. And did he show you his ID at that point?
A. Yes, he did.
Q. Tell the Court about that.
A. He got his ID. He put it up against the window. And I could see -- I could verify it had his name as it appeared on the previous ID, his date of birth, and then at the bottom where he was born.
Q. What did it say?
A. It had Jaime Quintanilla Chavez, and then it had his date of birth of February 26, 1990.
Q. And then in terms of where he was born, what did it say?

A. I believe it said *Cortés* and then *San Pedro Sula*.
Q. Is that in the country of Honduras?
A. Yes.
Q. So you identified this person as the person you were looking for?
A. Correct, yes.
Q. Did you continue to give the defendant commands?
A. Yes.
Q. Did you try to open the doors?
A. I can't recall if I tried to open the front door or not. I might have.
Q. Okay. Did you say anything to the defendant about what would happen if he did not roll down the window?
A. Yes. I told him if he didn't open the window we would breach it.
Q. And did he comply at that point?
A. No.
Q. Now, you mentioned something about the press that's happening, and did that cause you concern about being in the part of town you were in?
A. Yes.
Q. Why?
A. We do a lot of enforcement action in that area and so it's not really friendly towards ERO.
Q. Are you met with resistance?

A. Resistance, protestors, things of that nature.

THE COURT: That morning, who was there? What spectators? How many people were around?

THE WITNESS: I don't recall.

THE COURT: You better recall. How many people were there?

THE WITNESS: At that -- it was us, and I heard some people yelling from I believe across the street, but I don't recall how many people exactly.

THE COURT: So you didn't see any other spectators?

THE WITNESS: I wasn't -- no, sir. I mean, no, Your Honor.

BY MS. WANNARKA:

Q. Did you hear people yelling at you?

A. I heard some yelling, yes.

Q. Did you hear what they were saying?

A. No, I couldn't make it out.

Q. When you and Agent Carl decided then to breach the defendant's window, why did you decide to do that?

A. He wasn't complying with the orders. We had positively identified our target. And so -- and then like we said earlier, the area of town and totality of the circumstances, officer safety to stay there on the side of the road.

THE COURT: Don't just give me officer safety. Give me specifics. What did you see or hear that gave you the

impression that your safety was in danger?

THE WITNESS: It was he was on his phone calling. He was --

THE COURT: Did you hear what he was saying?

THE WITNESS: I couldn't make out what he was saying.

THE COURT: What else you got?

THE WITNESS: The proximity to his residence, just -- it's just a -- just the area that we're in. It's like I said, you are bound to attract protestors or people that come out and try to intervene.

THE COURT: But you didn't see anybody?

THE WITNESS: I don't recall seeing anyone, no.

BY MS. WANNARKA:

Q. Were there two DPS body cameras being worn at the scene?

A. Yes.

Q. Were they at the point of where you interacted with the defendant from the very beginning, or did they come halfway through?

A. They came some point afterwards.

Q. So are you aware of the two body camera videos that exist here in this case?

A. Yes.

Q. Have you seen them?

A. Yes.

Q. They -- do they pick up about where we are in this chain

of events?
A. Yes.
MS. WANNARKA: Your Honor, this might be a good time now to play the two videos. The government does offer Government's Exhibits 1 and 2 into evidence. They are the two DPS body cam videos.
MS. DOUENAT: No objections.
THE COURT: Those are admitted, 1 and 2.
*(Government's Exhibits 1 and 2 received into evidence)*
MS. WANNARKA: Your Honor, would --
THE COURT: Just to be clear, I didn't admit 4. 4 is admitted. You never asked for 3 to be admitted.
MS. WANNARKA: The government offers Government's Exhibit 3 into evidence.
THE COURT: Any objection?
MS. DOUENAT: No objection.
THE COURT: 3 is admitted.
*(Government's Exhibits 3 and 4 received into evidence)*
MS. WANNARKA: Your Honor, may the government produce the first two, the two videos?
THE COURT: Do you want to publish? Yes.
MS. WANNARKA: Publish, yes. The first video is about 12 minutes and the second video is about 9 minutes.

*(Playing clip)*

BY MS. WANNARKA:

Q. Officer Hernandez, just to get everybody's bearing, the white truck that is in the screen, is that the defendant's truck?

A. Yes.

Q. Is he still in the truck?

A. Yes.

Q. Is that you on the driver side, so it would be on the right-hand side of what we're looking at?

A. Yes.

Q. And who is on the left-hand side?

A. That's Special Agent Carl.

Q. Okay.

THE COURT: Is this Government's Exhibit 3 or 4?

MS. WANNARKA: 1.

THE COURT: 1. And just for the record, one notes that there are no spectators on the street whatsoever.

BY MS. WANNARKA:

Q. Okay.

*(Playing clip)*

THE COURT: Pause.

So how much time has passed before these guys got here? I mean, I'm seeing him reach already for a battering of the window and we're not even a minute into the screen?

MS. WANNARKA: No, Your Honor. The videos, DPS didn't arrive on the scene --

THE COURT: That's what I'm trying to figure out. How much time was beforehand?

BY MS. WANNARKA:

Q. If you had to estimate, Officer Hernandez, from when you and Agent Carl first stopped the truck to where now the window is about to be breached, about how much time has elapsed?
A. I want to say maybe three to five minutes, rough estimate.
Q. Okay.

THE COURT: Go ahead.

*(Playing clip)*

BY MS. WANNARKA:

Q. So which vehicle or who was in front of the defendant's truck, causing him to stop?
A. That was the vehicle from DPS.
Q. DPS made the scene with their vehicle there?
A. Yes.
Q. All right. Thank you.

*(Playing clip)*

Is that Agent Carl there that was pulling the rest of the window out?
A. Yes.
Q. All right. Thank you.

*(Playing clip)*

THE COURT: I want to make sure I'm seeing what you want me to see supposedly. He pulled his vehicle forward. I see somebody from HSI with handguns drawn. Then I see what apparently was the window already breached. I didn't see the actual breaching of it. At what point does Carl supposedly get assaulted?

MS. WANNARKA: Yes, Your Honor. And it's really hard to see and it's not clear on the video. Maybe if we can just go back just a little bit. It's when as the defendant pulls away Agent Carl breaches the window.

THE COURT: He pulled away though before there was ever a breach.

MS. WANNARKA: It was about simultaneously, Your Honor.

THE COURT: No. He went several feet and then he was stopped by a DPS officer truck in front.

MS. WANNARKA: That's right. That's right, but before -- but as he was pulling away, we'll go back --

Yes. Good. Thank you, Megan. Don't play yet.

But as the truck pulls away is when Agent Carl goes to breach the window, and as the truck pulls away his arm then scrapes on the glass. That's where the injury occurs. And so --

Can you do slow motion hits, Megan? Okay. Would you do that, please.

*(Playing clip)*

MS. WANNARKA: And the breacher is in his right hand. So the car is now starting to drive away and the breach -- and it just happened right there, in the lower part of the window.

Will you keep playing it a little further.

*(Playing clip)*

MS. WANNARKA: And that's where the breach is, right there.

THE COURT: Where is his hand?

MS. WANNARKA: Well, he is now -- the truck has driven -- is driven away. So his hand --

THE COURT: So what I'm trying to figure out is, he breaches. Does he get caught when he breaches --

MS. WANNARKA: Yes.

THE COURT: -- or is it because the car moved forward? It's the causation part that I can't -- I'm not clear on.

MS. WANNARKA: It's the truck moving forward is what caught his arm on the glass.

THE COURT: Are you going to show the jury something better than this in terms of video, or is this as good as it gets?

MS. WANNARKA: This is as good as it gets.

THE COURT: Okay. Continue.

BY MS. WANNARKA:

Q. Push play.

*(Playing clip)*

THE COURT: See, I didn't even see --

Go back again.

I don't see his arm in there when he pulls forward.

MS. WANNARKA: You don't see --

THE COURT: (Inaudible) running away from the vehicle after the defendant pulls forward.

MS. WANNARKA: That's correct, Your Honor. The injury, the breach and the injury are not on the video.

THE COURT: So how are you going to prove beyond a reasonable doubt that an assault took place here?

MS. WANNARKA: Agent Carl will testify as to what happened.

THE COURT: Okay. Go ahead.

*(Playing clip)*

THE COURT: Is this the same officer who got injured the first time supposedly?

MS. WANNARKA: Yes, Your Honor.

THE COURT: And he's not expressing any injury. I mean, I don't see him claiming he's injured in this thing at all.

MS. WANNARKA: You will see the injuries in a few minutes on his arm. And while we are stopped --

BY MS. WANNARKA:
Q. Officer Hernandez, in a moment you're going to be getting into the truck. We saw a little bit earlier of you getting the defendant out, yet he's not coming out. Why is he not coming out?
A. He's -- I believe his right hand is holding the steering wheel and he's just resisting, refusing to come out.
Q. Okay. Thank you.
*(Playing clip)*
THE COURT: Stop it.
So the background noise, is that his vehicle I'm hearing?
MS. WANNARKA: I believe so.
BY MS. WANNARKA:
Q. Is that the diesel vehicle that you hear in the background, Officer Hernandez?
A. I believe so, yes.
Q. And as we're about to see, the DPS officer with the camera we're watching goes to the other side of the truck. Why did he go to the other side of the truck?
A. It's a tactic that we utilize to extract persons from the vehicle. He's going to push him out as I extract him.
Q. But we'll end up seeing you were able to get him out?
A. Yes.
Q. All right. Thank you.

*(Playing clip)*

Why is it taking so many people to get him into custody?

A. He's resisting. He's not physically fighting us, but he's trying to put his arms underneath his body.

Q. Okay. Push play.

*(Playing clip)*

THE COURT: Stop here.

So I'm seeing this defendant in front of me. He looks all of 150 pounds from here.

How tall is your client, Ms. Douenat?

MS. DOUENAT: He is 5-5, is what I thought we had. No, I'm sorry.

You're 5-5?

He's 5-5.

THE COURT: How much do you weigh?

MS. DOUENAT: 128 pounds.

THE COURT: Has he changed in appearance since you arrested him?

THE WITNESS: Can I see him, sir? I mean, Your Honor.

THE COURT: Why don't you stand up, please.

THE WITNESS: No.

THE COURT: Go ahead.

BY MS. WANNARKA:

Q. Do you recall that the defendant was resisting you --

A. Yes.
Q. -- to the point where you needed more than one person to get him handcuffed?
A. Yes.
Q. Well, describe that, please.
A. Well, during the shuffle he's refusing. You hear him saying commands to put his hands behind his back and he's pulling away. He's pulling away both arms. I believe the agent was on top of him, but as we were trying to secure his left arm he was actively resisting, not allowing us to get it.
Q. Is there something significant about when a person is holding their arms underneath them that gives them more strength to -- that it's harder for you to get their hands away?
A. Well, we are stronger in our core, so if we stay compact and tight it is a lot harder to pull your arm from away from inside you.
Q. Is that what was happening?
A. Yes.

*(Playing clip)*

Q. Is he yelling to somebody?
A. Yes.
Q. Who is he yelling to?
A. I just hear him saying "Ophelia," [phonetic]. I don't know who that is.

Q. You didn't know if he was yelling to somebody that was standing around?

THE COURT: There was nobody there, so don't even go there, Counselor.

BY MS. WANNARKA:

Q. Okay. Push.

*(Playing clip)*

THE COURT: Let's stop there.

Where are we at now? We're at 07:40:22.

Is this the first time you are asking him whether he's got permission to be here in the United States?

THE WITNESS: Yes.

THE COURT: Next.

*(Playing clip)*

THE COURT: Stop here.

Who was the officer that was supposedly injured? Is it the guy taking photos now?

MS. WANNARKA: Yes, Your Honor.

THE COURT: And to be clear, earlier, and this was all in Spanish, but he's saying something about second chances and you're telling him, "No second chances. We gave you a chance to open the car door," so you did all this because he didn't open the car door. That was the gist of this Spanish conversation, correct?

THE WITNESS: I'll have to listen again.

MS. WANNARKA: I can't -- I mean, I don't --

BY MS. WANNARKA:

Q. Did you listen to the -- what was being said?

A. Can I listen again?

THE COURT: Go back.

MS. RAMIREZ: How far?

THE COURT: I'll tell you when I heard it. Little bit more. Right there. Go back a little bit more. Keep going. Keep going. Let's try there. Move forward just a bit. Let's get him against the truck. Right there. Let's start there.

*(Playing clip)*

THE COURT: Right there.

So you told him, "I gave you a chance. I gave you a chance. You wouldn't open the door," correct?

THE WITNESS: Yes. I did say that, yes.

BY MS. WANNARKA:

Q. Okay. Thank you. Push play.

*(Playing clip)*

THE COURT: Let's stop here.

And so the court notes, it's at 7:42, almost 7:43, no spectators are seen in the area. No obscenities are being heard being yelled at.

Anything else that we need to see here?

MS. WANNARKA: From this video, no, Your Honor.

The second video, though, I think the Court would want to see that one.

THE COURT: Okay.

MS. WANNARKA: If I could just follow up with one more question before we switch videos.

BY MS. WANNARKA:

Q. Was the defendant at some point talking about his dog?

A. Yes.

Q. Was there a small dog in the truck?

A. Yes.

Q. Did you facilitate a phone call from your vehicle so that he could call somebody to pick up his dog?

A. Yes.

Q. And then did someone come pick up the dog?

A. Yes.

Q. A lady?

A. Yes.

Q. So the dog was then --

A. The dog was picked up, yes.

Q. -- recovered?

Okay.

MS. WANNARKA: Okay. Thank you. That is all for Government's Exhibit 1. If we could now, Your Honor, publish Government's Exhibit 2. It's a shorter video from the other officer DPS agent that has a body cam.

BY MS. WANNARKA:
Q. *(Playing clip)*
Are these the DPS vehicles we're looking at?
A. Yes.
Q. Is there sometimes a sound lag with DPS videos, when they are first turned on, like a delay?
A. I think it's like a -- it goes back 30 seconds.
Q. Stop.
Is that the small dog?
THE COURT: This is 2?
MS. WANNARKA: This is Number 2.
THE COURT: Oh. So everything has taken place already and this is clean-up at the end?
MS. WANNARKA: Yes, because DPS arrived after the window breach.
THE COURT: And so what am I supposed to be looking for here?
MS. WANNARKA: It just was another angle, Your Honor. If the Court doesn't need to see it --
THE COURT: Yeah, no. This is all after the fact.
MS. WANNARKA: Okay. Then --
THE COURT: It's notable that they rescued the dog. I'll take that into account.
MS. WANNARKA: Thank you, Your Honor. The government passes the witness.

THE COURT: I had one case where the San Antonio Police Department shot the dog.

MS. DOUENAT: Yeah. That was my case.

MS. WANNARKA: They were concerned about the dog. They wanted to pick the dog up.

MS. DOUENAT: Exhibit 4?

MS. WANNARKA: He has it.

MS. DOUENAT: Yeah. I'll get it from him.

Thank you. Appreciate it.

THE WITNESS: Yes.

CROSS-EXAMINATION

BY MS. DOUENAT:

Q. Good afternoon, Agent. How are you?

A. I'm good. Thank you.

Q. So you mentioned you received a tip from the Alpine office?

A. It originated from the Alpine office.

Q. And somebody in your office forwarded it to you?

A. Someone from the HSI San Antonio office forwarded it to me.

Q. And that would have been on the 14th of June, is that right?

A. Yes.

Q. Six days before you went and was the lead operator and team lead in this operation, is that correct?

A. Yes.
Q. And it came from, I'm assuming, Noel Vidal?
A. Yes.
Q. And in his message to you, it was, "Good morning. Got this info from a colleague in Alpine. It will be an easy target for this weekend" -- correct? -- "operations?"
A. That's what it says.
Q. Yes. And that's the first time you saw it, once he said it was going to be an "easy target for the weekend operations," correct?
A. That's the first time I saw that email.
Q. And so before that you hadn't done any research or anything and somebody already in your office said it was an "easy target?"
A. It wasn't in my office.
THE COURT: That's not answering the question.
BY MS. DOUENAT:
Q. Noel Vidal is from whose office?
THE COURT: One second. I want an answer to that question.
MS. DOUENAT: Sorry.
THE WITNESS: Can you repeat?
BY MS. DOUENAT:
Q. Did someone in your office called Noel Vidal forward you this message?

A. Yes.

THE COURT: No. The question, however, was, Before you did any research, one of your compatriots were saying, it was an easy arrest?

THE WITNESS: That's what they said, yes.

BY MS. DOUENAT:

Q. And this was before you even tried to check whether this tip was valid or not, correct?

A. Correct.

Q. And it was already in the mind of your colleagues that this was going to be part of the weekend operations?

A. I don't know what was in his mind.

Q. When someone says this will be an "easy target for the weekend operations," what does it mean to you?

A. That it's going to be a weekend operation.

Q. Okay. So already before the tip was verified you had -- your colleague had in his mind that this will be somebody to arrest over the weekend, correct?

A. Yes.

Q. After that you mentioned that you looked at certain websites?

A. Databases.

Q. Databases, correct. In the databases is there any IRS information?

A. There would be work authorization.

Q. Would there be someone who pays taxes?
A. Only if they have a work authorization.
Q. So basically if somebody pays taxes and has an ID number from -- a federal income tax ID number to file their taxes, would that appear on the databases?
A. I've never seen anything like that, so... We don't have full access to the UPAX. We're only allotted certain accesses. So if that would appear, it wasn't under my access so I didn't see anything like that.
Q. So what does your access give you?
A. What I stated earlier.
Q. Which is?
A. The derogatory, applications for travel, and permissions to travel I believe.
Q. So if somebody was here legitimately in this country they wouldn't be asking for permission to travel?
A. If they were here, if they entered as a nonimmigrant Visa it would show up.
Q. But if they entered on an immigrant Visa, would it show up?
A. Yes.
Q. You mentioned the fact that -- well, let me ask you this.
So when you read this email, you only looked to -- you spoke to this lady, correct?
A. Yes.

Q. Did you do a criminal investigation on her?
A. No.
Q. Did you look her up?
A. No.
Q. To find out if she was credible?
A. No.
Q. Did you -- why not?
A. I didn't run her name. I just didn't.
Q. And did you call her daughter to find out what she had to say --
A. No.
Q. -- about this individual?
A. No.
Q. So you didn't corroborate with information from someone she already said knew this person?
A. No, I did not.
Q. So you didn't speak to anyone who knew this person except for the one lady who said this person is here illegally, correct?
A. Correct.
Q. Even though she gave you information that this individual could be here illegally and that her daughter has problems with him and she is someone who is being abused by him, correct?
A. That was in the email, yes.

Q. Did you look her daughter up?
A. I don't know her daughter's name.
Q. Okay. When you talked to her, did you get her daughter's name?
A. No.
Q. So you had no way to find out whether Yolanda Torres Molinar is a truthful person or not?
A. No.
Q. Because you didn't do any research on her?
A. On her, no.
Q. Or her daughter, for that matter?
A. Correct.
Q. On Franklin Quintania Chavez, you mentioned that there was no date of birth or Texas driver's license, or any other information except for his name, correct?
A. I believe only his name is in the email.
Q. Did you look up his name in the database?
A. No.
Q. You mentioned that you did surveillance twice before the weekend, is that correct?
A. Before the 20th, yes.
Q. So you received this on the 14th around -- let's see. It looked like at 9:32 a.m. -- hold on. No. It was at 6:53 a.m., June 14th, one Saturday, from Noel Vidal, and then I guess the Friday, so, is when you arrested him, correct?

A. If that's the 20th, yes.
Q. And it looked like you forwarded this to Steve Fuentes that day of the arrest at 9:32 a.m., is that correct?
A. Yes.
Q. So by then he was already arrested?
A. Yes.
Q. Okay. So by 9:32 a.m. Steve Fuentes, who was the one that sought the warrant, correct?
A. The affidavit?
Q. Yes.
A. Yes.
Q. Had already received information that this was based on a tip not because of a deportation removal order, correct?
A. I don't know. He received that email.
Q. But it was sent at 9:32 a.m., correct?
A. Yes.
Q. To his email address, right?
A. Yes.
Q. Do you get your email address on your phone?
A. We do get notifications, yes.
Q. When you set up surveillance, you write notes that you surveilled the house?
A. No.
Q. You just remember it?
A. Sometimes. Sometimes I forget.

Q. And in this particular occasion you remember doing two times surveillance, is that right?
A. Yes.
Q. But sometimes you forget?
A. Yes.
Q. And there's no notes saying when you went by the house, how long you were there, or anything like that?
A. No.
Q. And who you were with, correct?
A. Correct.
Q. So we have to take your word for it?
A. Yes.
Q. You didn't write a report on this incident until much later, is that right?
A. As far as "incident," what are you -- like the arrest? We did a report after we made the arrest.
Q. Right. What date was your report written?
A. June 20th.
Q. It was written on June 20th?
A. The day of the arrest?
Q. Yes.
A. I don't know what report you are talking about.
MS. WANNARKA: A 213?
MS. DOUENAT: No. I'm talking about --

BY MS. DOUENAT:
Q. You write an incident report, is that correct?
A. For what?
Q. For the arrest. When somebody gets arrested, you write a report?
A. Yes, on the day of the arrest.
Q. You're the team lead.
A. I take them back to the office and I process them in our system. And that's the day -- the day of the arrest is when we process them.
Q. So the I-213 is what you are talking about?
A. Yes. I don't know what you are talking about.
Q. That's fine. If that's the report you write as the team lead on the day of the incident, that's all I needed to know.
And that was written on June 20th?
A. Yes.
Q. When you were surveilling the house, you mentioned that you saw somebody else in the house?
A. There was another vehicle there.
Q. And did you see somebody else in the house?
A. Not inside the house, but leaving the house.
Q. So were they leaving the house before Mr. Quintanilla Chavez?
A. On the day of the 20th? Yes.
Q. Yes. How long were you there already surveilling, before

dawn you said?
A.  Before dawn, yes.
Q.  And so you waited until a little bit after dawn, around 7:30, is that right?
A.  For what?
Q.  To then follow him.
A.  Oh.  We waited until he left and then we followed him.
Q.  And that was around 7:30?
A.  Around there, after sunrise.
Q.  Do you call anyone to let them know that you are about to stop someone?
A.  We announce on the radio that he was leaving.
Q.  And who records this?
A.  I don't think it's recorded.
Q.  So there's no dispatch that you call to say that this is happening?
A.  No.
Q.  You just tell your team, is that what it is?
A.  Yes.  We share a VHF channel to keep communication with the DPS.
Q.  So you saw the dog come out of the house, is that right?
A.  I don't recall seeing a dog.
Q.  So you see an individual get in his car and you don't see the dog?
A.  No, I don't recall seeing a dog.

Q. But you saw him put on his shoes?
A. I saw him put on his shoes, yes.
Q. It's fair to say this is still summer -- right? -- in Texas?
A. Yes.
Q. And it's pretty humid out there and hot?
A. Yes.
Q. So the dog obviously wasn't in the car before he got in the car, is that right?
A. I don't know.
Q. You were surveilling the residence for predawn, before dawn, and then he left right after dawn, correct?
A. Yes.
Q. You said that he didn't start -- or Agent Carl is the one that goes in front of you and then you follow him, correct?
A. Yes.
Q. And the lights are turned on, on these unmarked vehicles, right?
A. Yes.
Q. And that happens half a mile after he left the house?
A. About, yes.
Q. So when you're on Culebra?
A. We activate -- I believe we activated lights on Culebra, yes.
Q. And shortly after that he pulls over, correct?

A. Yes.
Q. In a street off the road?
A. Off Culebra, yes.
Q. And he parks on the side of the road?
A. Yes.
Q. And he does this because he sees you with the lights on. So he's complying with the lights, is that right?
A. Yes.
Q. And he is parked on -- against the road away from traffic, is that right?
A. Off of Culebra, yes.
Q. Yes. Now, Culebra is a busy road?
A. Yes.
Q. And the street you were on, do you remember the name of the street?
A. Consuelo, if I'm saying it right. I might be saying it wrong.
Q. You're saying it fine. Consuelo.
And it's a neighborhood, right?
A. Yes.
Q. And there's not much traffic going on, is that right?
A. On Consuelo?
Q. Yes, on Consuelo.
A. There is traffic but I don't recall how many cars passed by.

Q. Well, at least in the video that we saw, there were no cars passing by, is that correct?
A. I think there were a couple cars that passed by in the video.
Q. Okay. Would you agree that the video is the best, accurate -- more accurate than probably your recollection?
A. Yes.
Q. Okay. DPS is in the front, like they are ahead of -- on Consuelo, is that right?
A. Yes.
Q. And they are kind of blocking the road?
A. I don't think they were blocking the road. I think they were parked off to the side like he was.
Q. And at some point they get in the middle of the road?
A. I believe when he takes off they come into the middle of the road.
Q. So the officers are already out of their car videotaping before he takes off. So they are already out of their vehicles and their vehicles are in the middle of the road, since the car takes off and stops in the middle of the road?
A. One special agent gets out, which is the first body camera. And I believe his car was on the side of the road.
Q. Which vehicle did he have?
A. The silver Ford.
Q. Okay. And so the silver Ford is on camera and so we can

see where it's located, correct?
A. Right.
Q. And then the other vehicle that the DPS trooper has, is what?
A. I don't recall the make and model, you would have to --
Q. But it's a truck?
A. Yes.
Q. And again, they are unmarked?
A. Yes.
Q. When the DPS trooper, the first one, the first video camera came out, he had his gun drawn, is that correct?
A. When he first got out of his vehicle?
Q. Yes.
A. I didn't see a gun.
Q. Were you paying attention?
A. I was focusing on the driver.
Q. And you mentioned that before the camera started, it had already been three or four minutes of you asking him to open the door, correct?
A. I believe so, yes.
Q. Would you agree the diesel truck is very loud?
A. Yes.
Q. And you mentioned that you couldn't hear what he was saying on the phone and when he was talking to someone on the phone, correct?

A. Correct.
Q. How do you know he could hear you?
A. He acknowledged me when I called him by his name and he showed me his ID when I asked him to show me his ID.
Q. So he did what you told him to do, show him [sic] his ID?
A. Yes.
Q. And he showed you his ID?
A. Yes.
Q. And then automatically the first thing you did was ask him to get out of the car or open the door, correct?
A. I think so, yes.
Q. You didn't ask him if he was here illegally?
A. No.
Q. You didn't ask him if he had papers to be here?
A. No.
Q. You didn't say, "You are not here with papers, so we need to arrest you," correct?
A. Correct.
Q. You didn't inform him of what you were going to do?
A. I just asked him to get out.
Q. When you were arresting him, he said he was confused, he didn't know what y'all were doing, did he not tell you that in Spanish?
A. Yes.
Q. And in fact, you said you don't understand who Ophelia is.

You understand Spanish, correct?
A. Yes. To an extent, yes.
Q. Does *auxilio* mean anything to you?
A. No.
Q. Would it mean "help" in Spanish?
A. I don't know the word for help. The only word I know is *ayuda*.
Q. Okay.
MS. DOUENAT: Okay. Your Honor, at this point, the interpreter is in the courtroom. I would like to ask if she knows what *auxilio* means for the record.
THE COURT: Who?
MS. DOUENAT: The interpreter.
THE COURT: So the interpreter is not a witness.
MS. DOUENAT: Okay. That's true. She just interprets.
BY MS. DOUENAT:
Q. So you don't know that word in Spanish. Do you speak Spanish well?
A. I wouldn't say I'm fluent.
Q. You want to say you are fluent?
A. No. I wouldn't say I'm fluent.
Q. So you mentioned that you were talking to him both in English and in Spanish, correct?
A. Yes.

Q. Do you know whether he understands English?
A. I do not know if he understands.
Q. And you wouldn't know whether he also understood what you were saying, except for the fact that he did answer to his name and showed you his ID?
A. Correct.
Q. Shortly after that, y'all, in Spanish, said you were going to break the window, correct?
A. Yes.
Q. And that's it, not without an explanation or anything, except that he's not leaving, he's not getting out of the car, you were just going to break the window?
A. Right.
Q. And you mentioned it's because you were concerned for officer safety?
A. Yes.
Q. And it's because he was on the phone?
A. Was on the phone, the proximity to his residence, and the totality of the circumstances with --
Q. So the proximity to his residence, you already talked about the person who lived there already being gone, correct?
A. The person that previously left before him, yes.
Q. Right. So that person is not there anymore?
A. Right.
Q. So the vehicle who was there is gone?

A. There was another vehicle there.
Q. Right. The other vehicle being his vehicle, because there's two vehicles?
A. Yes.
Q. Right. So he's taking the truck instead of the car, correct?
A. Correct.
Q. So there's no other person there?
A. I'm not sure if anybody else was still there.
Q. And there's nobody in the streets, correct?
A. I don't recall seeing anyone right there where we were.
Q. You mentioned that somebody at some point was yelling, but you couldn't hear them, correct?
A. I could hear some yelling, but I didn't know where it was coming from.
Q. Or what they were saying, correct?
A. I couldn't make it out.
Q. So it may not have been anything to do with this, correct?
A. I'm not sure.
Q. When the officer -- so you did not -- you said you were going to break the window but you're not the one that broke the window, correct?
A. Correct.
Q. And that's because Officer Carl had already gotten his tool to break the window, correct?

A. Yes.
Q. And your tool was in your car?
A. Yes.
Q. And you are which vehicle?
A. I was the Ford Explorer.
Q. So you were behind the Camaro?
A. Yes.
Q. And the Camaro was behind the truck?
A. Yes.
Q. So when he pulled over, the Camaro pulled pretty close behind the truck, is that correct?
A. I don't recall. If that's what it shows.
Q. And you were parked really closely behind the Camaro?
A. I parked right behind him.
Q. And you were still not on Culebra so there was still plenty of room, right?
A. We were on Consuelo.
Q. On Consuelo, meaning that there was plenty of room with the truck, the trailer, the Camaro, and your truck?
A. Right, yes.
Q. Right. And you still weren't on Culebra is what I meant.
A. Oh, yes. We were off Culebra, yes.
Q. So as far as officer safety goes, you were pretty safe in this sleepy, pretty much, neighborhood at 7:30 in the morning, correct?

A. Safe from what? From traffic?
Q. From traffic, correct.
A. Could be, yes.
Q. Yes. And there was definitely nobody in the street, so from people as well?
A. Not right there. I don't recall seeing anyone.
Q. Nobody was marching with banners or saying, "We don't like ICE," correct?
A. Correct.
Q. So with little information, you wanted him out of the car, you didn't give him any information except that he needs to get out of the car?
A. Right.
Q. And then you were concerned because he was talking on the phone?
A. Yes.
Q. Could you see his dog?
A. I don't recall if I saw him. He might have been on the passenger seat.
Q. And you couldn't see through the window at the passenger seat?
A. I don't recall if I saw his dog. I could see him and then him on his phone.
Q. In the video, on the second video, you can actually see the dog, is that correct?

A. Yes.
Q. And in fact, when you were handcuffing him, his only concern was his dog?
A. He kept talking about the dog.
Q. Right. He wanted someone to come and pick up the dog. He was concerned about his dog?
A. Right, yes.
Q. And in fact, at one point, before that, you were like, well, you should have thought of that before?
A. I don't know what I said. If that's what it says on the video.
Q. After he's arrested and handcuffed is when you asked him where he's from, correct?
A. Correct.
Q. And you asked him if he has papers?
A. Yes. That's slang for permission.
Q. And -- I'm sorry. What did you say?
A. It's like -- it's when you ask him if they have permission to be here, it's papers.
Q. So you asked him if he has permission to be here?
A. Yes.
Q. And at some point he's trying to talk to you but you're like, well, you don't have any papers, and that's that. So you don't even listen to his response. You're just cutting him off, is that right?

A. Once he responded, I cut him off, yes.
Q. He at some point also talks about paying taxes?
A. I don't recall hearing that.
Q. And he talks about being here for twelve years?
A. I think he said something along the lines of that.
Q. So the best record of that would be the audiotape, correct? I'm not going to repeat the audio tape because we've already seen it, but --
A. If it says it on the audiotape, that would be the best record, yes.
Q. You were just busy trying to figure out the logistics about getting the truck picked up by a tow company, correct?
A. Yes.
Q. And you were talking to DPS about that at the time?
A. Yes.
Q. At this point, you had already arrested your target?
A. Yes.
Q. In fact, the next day you went to his house, didn't you?
A. When?
Q. The next day.
A. Me?
Q. Yes.
A. No.
Q. You did not arrest somebody else in that residence the next day?

A. Oh, yes. Yes, we did arrest someone in that residence the next day. I believe it was the next day.
Q. Right. You went to his house the next day?
A. If that's the next target. I don't recall all the targets the next day.
Q. Do you know who that target was?
A. Yes. I now recall, yes. It was the Impala that had left before him.
Q. And what did you know about that Impala?
A. That it was registered to an illegal alien. I believe he had been deported before. I would have to look at his case, but --
Q. So why didn't you arrest him the first time?
A. He wasn't the target of our arrest that day.
Q. But I guess you took down his number, figured out he was an illegal alien, and you decided you would go back the next day and arrest him?
A. Yes. DPS did a traffic stop.
Q. Why didn't DPS do a traffic stop here?
A. They weren't available.
Q. They were with you.
A. Those are special agents. They don't do traffic stops.
Q. And that would have been the way he was arrested in the Impala the next day. And he did have immigration history, correct?

A. I believe so.
Q. Right. You went about it with uniformed police officers?
A. Yes.
Q. Because that individual actually had an immigration file?
A. I think so, yes, because I remember taking -- when we ran his name, yes.
Q. That's because you weren't certain that this individual was here illegally?
A. Which one?
Q. Mr. Quintanilla Chavez.
A. Well, you're not 100 percent certain, no.
MS. DOUENAT: Your Honor, may I have a moment?
THE COURT: Yes.
MS. DOUENAT: I'll pass the witness.
THE COURT: I've got some more questions.

EXAMINATION

THE COURT: So Mr. Hernandez, Steve Fuentes, is he your supervisor, or are you his supervisor? What's the role between the two of you?
THE WITNESS: No, sir. I mean, no, Your Honor. He is special agent with Homeland Security Investigations. He's -- we're different agencies.
THE COURT: And so in this email that you were shown earlier, Steve Fuentes was part of the email chain and he knows about the tip, correct?

THE WITNESS: Yes. I think -- I believe he asked how he became a target and I told him I got a tip from HSI Alpine. So I forwarded it to him to show him all the documents and everything that was in that email.

THE COURT: And there is nothing in that email chain about a final order of removal, is there?

THE WITNESS: No, there there's nothing in that email chain.

THE COURT: And there's nothing in this email chain about an A-File, correct?

THE WITNESS: Correct. There's nothing in there about that.

THE COURT: So Steve Fuentes just made all that up when he wrote that in an affidavit and presented it to one of my magistrate judges?

THE WITNESS: I'm not sure what it was.

THE COURT: That was obviously incorrect information?

THE WITNESS: It was incorrect information.

THE COURT: That's why you guys are in trouble with this courthouse today. A lot of the judges are upset with you-all right now about giving incomplete and inaccurate information. Do you understand that?

THE WITNESS: Yes, Your Honor.

THE COURT: Now, when you're making these arrests, can you go inside a home?

THE WITNESS: Depending on the circumstances.
THE COURT: Do you need a warrant signed by a judicial officer?
THE WITNESS: Yes, if I'm going to do -- yes.
THE COURT: And so the same thing applies to cars. If you want to go in a car, you need to get a judicial warrant, don't you?
THE WITNESS: If it's a -- I think so, yes.
THE COURT: Yes, you do. And in this case, you didn't get a warrant, did you?
THE WITNESS: No, we did a warrantless arrest.
THE COURT: Yeah. You did a warrantless arrest, correct. So in this case we saw the video. At the time that he showed you the ID, you had probable cause information to just stop everything right then and there and call in and get a warrant from a judicial officer to go inside the vehicle, didn't you?
THE WITNESS: I don't know if they would issue one since I didn't have a final order. I don't know if they would issue one.
THE COURT: So you went into a vehicle, unsure that even a judicial officer would not authorize?
THE WITNESS: Yes.
THE COURT: It only gets worse.
Now, you received this email chain from Vidal on the

14th and then the operation takes place the morning of the 20th. Is there anything in your records that show that from the 14th to the 20th you did everything that you said you did, checked the UPAX records, checked the Person Centric Query, you talked to the woman in Alpine? Is there anything that shows in written format that you did that between June 14th and June 20th?

THE WITNESS: No, only if the database records my searches. That would probably be the only way.

THE COURT: When you were doing all this, supposedly, surveillance on this defendant, did you know where he worked?

THE WITNESS: No.

THE COURT: You could have followed him in that truck until he got to work, exited the vehicle, and then arrested him, couldn't you?

THE WITNESS: Yes.

THE COURT: Any questions based on the Court's questions?

MS. WANNARKA: Not from the government, Your Honor.

THE COURT: Anything from the defendant?

MS. DOUENAT: May have a moment, Your Honor?

CROSS-EXAMINATION CONTINUED

BY MS. DOUENAT:

Q. Did you actually -- so you mentioned that you pulled out ACRIMe, correct?

A. Alpine sent the ACRIMe reports.
Q. But then you said you did that too?
A. No, I did UPAX.
Q. So Alpine actually takes a copy, they print it out what they found, correct?
A. That was on the attachments, yes.
Q. Why didn't you print out what you found?
A. I didn't find anything in UPAX. There was nothing to print out.
Q. Why didn't you print out the fact that there was nothing to find?
A. It's just going to show -- it's not going to have anything to print. It would just be a screen with his name on top.
Q. Correct. No encounters with the SAPD, nothing with immigration, nothing?
A. Right.
Q. Correct. When you did the -- you said there was another database that you looked up?
A. The PQCS, yes.
Q. Right. What did you find there?
A. Nothing. It resulted in zero results.
Q. And again, you didn't print that out either?
A. No.
Q. Or note it somewhere?
A. No.

MS. DOUENAT: All right. Thank you.

REDIRECT EXAMINATION

BY MS. WANNARKA:

Q. When you and Agent Carl stopped the defendant in his truck, did you believe you had probable cause to do so?

A. Yes.

Q. Why?

A. Under 8 U.S.C. 1357.

Q. Well, that is your authorization --

A. Right.

Q. -- yes, to interrogate and arrest the defendant, or someone suspected of being here illegally?

A. Right.

Q. But what formed your basis for probable cause to make the stop to interrogate and/or arrest?

A. I ran the information from our databases based on his ID with zero results for immigration, whether he's legally present or illegally entered the United States, and then once I asked him to show me his ID he showed me a newer version of the ID to positively identify him.

Q. And when you had done surveillance previously, previous to June 20th and identified the vehicles that were parked there at the Benrus address, did you search whether or not those vehicles were registered to this defendant?

A. Yes.

Q. So you had received the tip that he lives there and then you confirmed that vehicles registered to him were actually also at that address?
A. Yes.
MS. WANNARKA: I'll pass the witness.

RECROSS-EXAMINATION

BY MS. DOUENAT:
Q. Just on that note, they were registered to him, his name?
A. Right, yes.
Q. He actually took out the vehicles in his name and his date of birth?
A. It's registered to his name. I don't think it shows date of birth.
Q. That's fair. But the vehicles were in his name, not somebody else's?
A. Right, yes.
Q. And when you decided to tow the vehicle that was only half a mile from his house?
A. Yes.
Q. You wouldn't turn over the vehicle to a friend or family member, correct?
A. We have done it before, yes.
Q. But not in this case, you didn't?
A. Right.
Q. Why?

A. I think it was because it was part of an accident and I didn't know what they were going to do with the accident part.
Q. So when there is an accident, you have to file a report, correct?
A. Yes.
Q. And when somebody gets injured, you have to file a report too?
A. Yes.
Q. And if you don't, say -- I mean, obviously, if it happened because of something law enforcement did wrong, that's not good, correct?
A. Right, yes.
Q. So therefore, there has to be a reason that you did something right, correct?
A. For -- I don't understand your question.
Q. So if somebody gets injured on an easy target, there's got to be a reason why they got injured.
A. Yes.
Q. Not because you did something wrong?
A. I don't --
Q. Like you escalated this, when you shouldn't have?
A. No.
Q. You think that your protocol here was accurate?
A. Yes.
Q. Okay. But would you get in trouble or would you have a

problem if you used excessive force and an agent got cut in that process when you shouldn't have used excessive force?
A. Are you saying we used excessive force, or is this a hypothetical?
Q. No. It's a hypothetical. If excessive force was used when you're not supposed to use excessive force, could you be in trouble for that?
A. Yes. If -- hypothetically, if someone uses excessive force, yes, you could get in trouble for that.
Q. And if somebody gets injured in that process, that would be bad?
A. I would assume so, yes.
Q. All right.
MS. DOUENAT: Pass the witness.
THE COURT: Are you-all being taught or receiving oral or written directions that you can bust a window out of a vehicle without a judicial warrant?
THE WITNESS: It's oral, yes. Yes, Your Honor.
THE COURT: You have received oral directions of that?
THE WITNESS: Yes.
THE COURT: Who did you receive that from?
THE WITNESS: From the chain of command.
MS. WANNARKA: I don't have any further questions.
THE COURT: I'm sure you don't.

You may step down.

MS. WANNARKA: I have one more witness I'd like to call, Your Honor. The government calls HSI Special Agent William Carl.

THE COURT: I think I need a break.

*(Recess)*

(WILLIAM CARL, having been duly sworn, testified as follows:)

DIRECT EXAMINATION

BY MS. WANNARKA:

Q. Please tell the Court your name.

A. My name is Special Agent William Carl. I work for Homeland Security Investigations.

Q. How long have you been an HSI agent?

A. Approximately going on 15 years.

Q. Prior to being an HSI agent, what did you do?

A. I was an Immigration Enforcement Removal Operations officer for approximately four years.

Q. I want to draw your attention to the arrest that you participated in on June 20th, 2025.

A. Okay.

Q. You've been in the courtroom and you've heard the testimony to date, yes?

A. Yes.

Q. And so let's start with when you first learned you would

be on this arrest team. Was it that evening before?
A. It was the evening before. I received a text message from Hector. He text myself and the DPS agents and said -- he gave us an address that we were possibly looking at, and he said he would send out more information. And that was it for the night.
Q. And when you say "Hector," that's Officer Hernandez, who we just heard from?
A. Correct.
Q. So then the next day you went to that residence?
A. The next day I got in my car and I texted him. I was like where are we actually going to, because he suggested that --
Q. Just where did you go the next day. To the residence?
A. We went to the Benrus residence.
Q. And did you conduct surveillance in the car, or was that Officer Hernandez?
A. Officer Hernandez had the eye of the house.
Q. Did you?
A. I was down the street. I didn't have the eye on the house.
Q. So when -- so you sat in your car and waited to hear from Officer Hernandez?
A. Correct.
Q. And then you did at some point, yes?
A. Correct.

Q. And what did you do then?
A. He told me the suspect was departing and I watched the vehicle go past me and I pulled in behind it. And as I was following, I got on the radio and asked him, "Do you want me to pull it over," --
Q. And did you?
A. -- because typically -- he said yes. So I turned on my lights and my siren.
Q. And when you say "lights," it's the red and blue police lights?
A. Yes.
Q. Are you in a marked or unmarked vehicle?
A. I'm in an unmarked government vehicle.
Q. It's your government issued vehicle?
A. Correct.
Q. So you turn your lights on -- oh, backing up. Is Officer Hernandez now behind you?
A. He is behind me.
Q. Okay. Does he turn his lights on too?
A. Yes, he does.
Q. So you turn your lights on. What happens next?
A. I turn my lights on. We're on Culebra. He makes that immediate right turn and then he pulls forward and then he comes to a stop.
Q. On Consuelo?

A. On Consuelo, yes.
Q. When he comes to a stop, what do you do?
A. I pull up back behind his -- behind the trailer. Hector pulls up behind me. I get out of my car. I let Hector approach the driver side --
Q. When you say "Hector," are we talking about Officer Hernandez?
A. Correct. Officer Hernandez.
I let Officer Hernandez approach the driver's side of the vehicle because this is his --
Q. He's the team lead?
A. He's the team lead, yes.
Q. What do you do?
A. I went over to the passenger side of the vehicle to just assist to -- if anything happened, I was there.
Q. Are you able to hear from the passenger side what Officer Hernandez is saying on the driver's side?
A. Yes. I can hear him yelling at him, asking him his name. He was also asking him to roll down the window. He was asking him to open the door. He was giving him a bunch of orders.
Q. Do you recall if that was in Spanish or English?
A. It was Spanish and English.
Q. Were you giving any orders at this time?
A. No, I was just watching him.
Q. Did you try to open the door?

A. Yes, I did.
Q. Was the door unlocked or locked?
A. It was locked.
Q. Are you and Officer Hernandez communicating about next steps?
A. So he yells over to the DPS officer who is approaching us, the one who has the video camera, and asked if he has a window break. The DPS officer tells him no. He asks me if I have a window break. I didn't hear him at first because I was watching the guy inside on his phone and I thought he was talking to DPS still.
Q. So you could see the defendant on his phone?
A. Yes, I was watching him the whole time on his phone. Then he asked me if I had a window break and then I check. And I said yes, but I don't think he heard me because I was facing straight and I was going to walk around the front of the vehicle but I was like, what if he pulls forward.
So I walk back around to come around the back side of the vehicle. I didn't know Hector had said he was going to go back to his vehicle and he started walking back. He had already asked DPS to come up and stand at the driver side door.
And then as I came around the back side of the trailer, I was watching the trailer just in case the reverse lights came on. I don't remember seeing him. I remember walking up to

the door. So I'm like, okay. So I start to put on my gloves.
Q. As you get to this point where you're putting on the gloves, do you -- Officer Hernandez indicated he heard some yelling. Did you ever hear anyone in the area yelling?
A. Yes, but not at that point yet.
Q. Okay. All right. So let's -- we'll wait on that.
So you put the gloves on?
A. Yes.
Q. And we saw the video but walk us through what happens next.
A. So I took my time putting on my gloves, and once I had my gloves on --
Q. Would you hold on.
MS. DOUENAT: He can't hear the translation.
*(Pause in proceedings)*
BY MS. WANNARKA:
Q. So you put your gloves on. Please continue.
A. I took my time putting my gloves on because I'm giving the driver time to respond. I went and I checked the back door. I had the tool break window in my hand and I was going to ask him -- I went to go ask him just to roll down the window.
I was going to try to talk to him again to get him to open up the door, roll down the window. And that's when the car started forward. And since the car started forward, that's when I hit the window with the glass break. I felt the door

catch my arm, and that's why you can see in the video when I pulled away you can see me stumbling. You can see me stumbling to the left.

And then the trailer, literally I felt the wind from the trailer right off the side of my face. And you can see --

THE COURT: Let me stop you to make sure I got this correct. The truck moved first and then you hit the glass?

THE WITNESS: Yes, sir.

THE COURT: Go ahead.

BY MS. WANNARKA:

Q. When the -- so walk us through then. So you punched the glass and your arm got caught in it?

A. In the window, from where I hit the window. I was close to the window when he started pulling forward and he was pulling to the left. So like towards me, towards my direction.

So as I made impact, my arm kind of went in the window. And then that's when I got cut because I pulled my arm out. And then I stumbled and then that's when the trailer went right by me.

Q. When you say "stumbled," is that on the Body Camera Number 1 or Body Camera Number 2?

A. Number 1.

Q. Number 1. Okay. And so then you see the truck drive forward?

A. Yes.
Q. And then it backs up?
A. Correct.
Q. And when it backs up, does the trailer, in fact, hit the front of your vehicle?
A. Not when it initially backs up, no. He backs up and he comes to a stop. You can -- if you listen on the video, you can hear the gear box as he's changing. So initially he went into park, and you see me in my car.
But then he put it in reverse. And right as the DPS officer went to go pull out his weapons, that's when you see my door come open and that's when I got out of my car, because I'm thinking, I'm in a little Camaro. He's in a big truck with a trailer. He's going to -- you know, he's just going to throw me out of the way. That's when I got out of my car.
Q. So let's back up then. As he drives forward, you're injured, you go and get in your car?
A. Yes.
Q. Why did you do that?
A. I did that to -- because as he's backing up, he's heading towards Culebra, which has a lot of traffic going up and down that street. And I don't want him going into that street. So I pull up and stop about a vehicle length, half a vehicle length behind his trailer, so that way it stops him from pulling into that street.

Q. And then at some point his trailer backs up into the front of your vehicle?
A. Yes.
Q. And causes some damage?
A. Yes.
Q. About $2,000 worth of damage?
A. I would have to look at the estimate.
THE COURT: Let me make sure I understand the government's position. Last time we met I thought, and by the briefing, I thought the sole allegation in this case was the alleged forcible assault upon Agent Carl by the glass and the car moving forward. I thought that was the sole allegation you were making in this case.
MS. WANNARKA: The forcible resisting and those acts caused the injury. Not the forcible assault. Forcible resisting, evading, impeding, interfering with law enforcement.
THE COURT: So you're bringing other claims besides just his injury?
MS. WANNARKA: No, just that injury, but it's not the forcible assault theory. It's forcible resisting, impeding, opposing, interfering with, those other ways to violate 111(a). Those, in doing those acts caused the bodily injury of Agent Carl.
THE COURT: What confused me is you are now talking

about the damage to the vehicle. That's not part of this case.

MS. WANNARKA: Well, it's part of what happened. I was just explaining what happened because he mentioned he was in his vehicle.

BY MS. WANNARKA:

Q. So moving on.

THE COURT: So I'm still trying to figure out the government's charge. So now you are saying you are not proceeding on an assault theory, you are just proceeding on a resisting, interfering, and opposing theory?

MS. WANNARKA: And interfering, yes, Your Honor. And that in doing those, in forcibly resisting, opposing, interfering, impeding, in doing those, those acts caused the bodily injury to Agent Carl.

THE COURT: Do those -- does that theory of resisting, interfering, or opposing require intentionality by a defendant?

MS. WANNARKA: The Fifth Circuit has not required that.

THE COURT: Is it silent, or --

MS. WANNARKA: It's silent. The Ninth Circuit --

THE COURT: So there's no affirmative Fifth Circuit case that addresses this issue?

MS. WANNARKA: That's correct. The Fifth Circuit

that I have researched has not made a ruling on this.

THE COURT: And the Ninth Circuit does that?

MS. WANNARKA: The Ninth Circuit has said that in resisting, those acts can cause the injury.

THE COURT: Does it require intentionality?

MS. WANNARKA: No. But the Sixth and Seventh Circuit do require the intentionality. So there is a circuit split, and the Fifth Circuit is currently silent.

THE COURT: Thank you.

BY MS. WANNARKA:

Q. Agent Carl, at some point in all of this did you believe the defendant had an order of removal?

A. Yes, I did.

Q. Did you communicate that to Special Agent Steve Fuentes?

A. Yes, I did.

Q. Now, Agent Fuentes, he is a colleague of yours, he's another HSI agent?

A. Yes, he is.

Q. And was he serving in a case agent role when he executed and signed the affidavit and testified before Judge Chestney?

A. Yes.

THE COURT: What gave you the impression there was an order of removal?

THE WITNESS: Sir, I had been working with ERO for about three to four months at that point, with ERO Fugitive

Operations, and every operation that we had been on previously had had a final order of removal.

THE COURT: So you just guessed because of past cases this one had it too?

THE WITNESS: Yes, sir.

THE COURT: So how do you get a reasonable basis to believe just on, I guess it must have been, is that the theory?

BY MS. WANNARKA:

Q. You assumed that in this case, but did --

THE COURT: The assumption has got to be based on something concrete. It can't be on a, well, everything in the past has always had an order of removal so this one did too.

THE WITNESS: Your Honor --

THE COURT: This is a legal theory I'm fighting with her about.

THE WITNESS: Okay.

MS. WANNARKA: Well, Your Honor, he assumed based on his prior interactions with ERO coupled with a comment that one of the DPS CID agents made at the scene.

THE COURT: And where did that agent get this theory that there was an order of removal?

MS. WANNARKA: I don't know. And I don't know where he would have gotten that. The team lead Hernandez, he knew that there was not one.

THE COURT: So you're just guessing based upon in the past you thought there was one in this case?

THE WITNESS: Yes, sir, because Immigration ERO Fugitive Operations only typically executes these type of operations on people with warrants of removal. That's my experience.

And every time before that, and even when I was ERO, Fugitive Operations would only go after people with final orders of removal. So that's why I was thinking it was a final order of removal.

And I genuinely apologize to the Court about how much confusion this has caused.

THE COURT: Yeah. We rely on you-all to tell us accurate information. We can't sign arrest warrants and search warrants based on "I guess," or "Maybe." You have to provide us concrete facts, and we rely that you're being truthful with us about those facts.

So in this case I'm not going to sanction you and I'm not going to sanction Fuentes, but I'm giving you guys warnings that we need you, when you come up and do affidavits in the future, that you are verifying it. Now, I understand that sometimes you guys are acting as case agent roles and you don't have personal knowledge, but it's still incumbent upon you to check everybody else's work before you sign off on an affidavit. Does that help?

THE WITNESS: Yes, Your Honor. I agree.

MS. WANNARKA: I'll pass the witness.

CROSS-EXAMINATION

BY MS. DOUENAT:

Q. Agent Carl, you mentioned you were with ERO before?

A. Yes, I did.

Q. And ERO only does things if there's an order of removal, correct?

A. When I was there, yes. ERO Fugitive Operations would only do things with final orders of removal.

Q. Right. And so Mr. Hernandez, Officer Hernandez, is ERO Fugitive Removal, correct?

A. Correct.

Q. And this case did not have a final order of removal?

A. No, it did not.

Q. When did you find out?

A. I found out a couple days later because Steve called me and asked me to get the date of the final order of removal, so I checked in one of our systems and I didn't find them. And I told Steve, he doesn't have a final order of removal, and then he notified Sarah, our U.S. Attorney.

Q. Let me ask you this. Did you go with Officer or Agent Hernandez the next day to arrest the individual at the same Benrus house?

A. No, I did not.

Q. You don't know who was there?
A. No.
Q. Did you hear about that case, or no?
A. No, I have not.
Q. Did you see the person in the Impala leave that house?
A. No, I wasn't in a position to see anybody at the front of the house.
Q. Where were you?
A. I was down the street further on one of the next side streets parked up and back into a cul-de-sac, so...
Q. Were you closer to Culebra?
A. Closer to Culebra, yes.
Q. So you would have seen the Impala drive by?
A. I didn't see an Impala drive by.
Q. So you didn't see anybody leave. Was there any traffic that morning?
A. There was a few cars, a couple people leaving from the cul-de-sac. Besides that, I didn't see an Impala. I heard DPS talking about it on the radio, but I didn't personally see it.
Q. What was DPS talking about?
A. They were trying to figure out whether or not they were going to conduct a stop on the vehicle to verify who it was.
Q. So there was DPS there to conduct a stop on the vehicle?
A. It was CID. Not uniform division.

Q. But they were talking about doing a stop on the vehicle?
A. Yes, and they decided not to.
Q. So they could have done a stop on this particular car with Mr. Quintanilla Chavez, correct?
A. Yes.
Q. And they did not?
A. They did not.
Q. It was you and Mr. -- Officer or Agent Hernandez who performed the stop?
A. Not for the Impala, no. Nobody stopped him.
Q. No. For Mr. Quintanilla Chavez.
A. Quintanilla Chavez, it was myself and Officer Hernandez.
Q. Correct. But that same day, that morning, DPS, who was with you that day had talked about doing a traffic stop on an Impala, correct?
A. Correct.
Q. And they chose not to?
A. Correct.
Q. They could have performed the stop for Mr. Quintanilla Chavez, correct?
A. They could have, yes.
Q. But they did not?
A. They did not --
Q. Right.
A. -- because they weren't near. They weren't near him.

Q. No, but you were in communication with them and you could have asked them to.
A. Yes, but I can also conduct the stop.
Q. Because?
A. Because I have Title 8 authority to conduct stops to verify a person's immigration status.
Q. Did you know this person's immigration status before you arrested him?
THE COURT: One second.
You can stop anybody to verify immigration status?
THE WITNESS: No, sir. You have to --
THE COURT: You said that wrong. Why don't you correct that.
THE WITNESS: You have to have a reasonable suspicion to believe that person is in the country illegally in order to stop them.
BY MS. DOUENAT:
Q. And you would have believed he had an order of deportation removal, correct? In fact, that's what you believed when you broke the window.
A. I did believe he did have a final order of removal.
Q. You mentioned the fact that the vehicle or the truck moved forward, correct?
A. Correct.
Q. And that's when you decided to break the window?

A. Correct.
Q. So you decided to break the window of a moving vehicle?
A. Yes.
Q. Okay. So that's what caused your injury?
A. Yes. That's how my injury happened.
Q. Right. You -- when you were pulling -- well, when he was being pulled out of the vehicle, did you tell Mr. Quintanilla Chavez to "Shut your mouth up, your fucking mouth?"
A. I did tell him to shut his mouth. And then later on I found out I did tell him to "Shut his F'ing mouth."
Q. That's because he was asking him for help?
A. No, it's because Hector was telling him to be quiet and then I came up there and I said it. And my arm was bleeding. There was a lot of stress and anxiety and a whole bunch of different things going on. And at that point, there were people. There was a guy down the street yelling. There was people coming outside the house and taking pictures.
THE COURT: Just to make sure I'm clear. Did I see any of that in that video?
THE WITNESS: No, sir, but you can hear it. And I have the points where you can hear it.
THE COURT: Okay. I would like to see that.
BY MS. DOUENAT:
Q. So we could play it, if you have the points. Where are they?

A. Okay.
Q. This, of course, was after the fact, not before?
A. This is after the fact, yes.
Q. Right. Not before?
THE COURT: Oh, then. If that's the case, I don't need to hear it.
THE WITNESS: Okay.
BY MS. DOUENAT:
Q. This was after the guns were drawn, he was being pulled out of the car, and he was asking for help?
A. Correct.
Q. And you were telling him to "shut your mouth, your fucking mouth?"
A. Correct.
MS. DOUENAT: Give me one second.
Pass the witness.
THE COURT: Anything else?
MS. WANNARKA: Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. WANNARKA:
Q. I apologize. I failed to ask you about your injuries.
When your arm was cut in the window, what happened to your arm?
A. I had multiple punctures on my arm and some tears. And it hurt really bad and it was bleeding a lot. And you can see me

at one point holding towels up to my arm because it was bleeding so much. And that's another reason why when I opened up the door and Hector went in, I didn't help him, is because I felt the blood running down my arm because of how much it was bleeding.

Q. Did you seek medical attention for the injury?

A. Yes, I did.

Q. What did that consist of?

A. When I went in there, the doctor examined it. They went in and took an x-ray. And then they started examining the different puncture areas to see if there was any glass. And then they scrubbed it clean, which really hurt. And then they scrubbed it clean again and put some stuff on it. And then they wrapped it up.

MS. WANNARKA: Thank you. I'll pass the witness.

THE COURT: Anything based on that?

MS. DOUENAT: No, Your Honor.

THE COURT: Thank you. You may step down.

THE WITNESS: Yes, sir.

THE COURT: Any other witnesses?

MS. WANNARKA: No, Your Honor.

THE COURT: Does the defense want to call any witnesses?

MS. DOUENAT: If I could just recall Agent Hernandez. I just found out some information about the individual he

pulled over the next day about.

THE COURT: I'm curious. What's the relevance of that?

MS. DOUENAT: Well, there was no order of removal and he lied to the Court today that there was an order of removal.

THE COURT: Say that again.

MS. DOUENAT: So Mr. Bonilla, Danny Bonilla, he testified on the stand. The next day they arrested the man in the Impala because he had an order of removal. He has no order of removal.

MS. WANNARKA: Your Honor, he wasn't prepared to talk about another person today.

THE COURT: But I think what she's getting at is this guy is just making up these allegations of orders of removal.

MS. DOUENAT: That's exactly what I'm saying.

THE COURT: Yeah.

MS. WANNARKA: He wasn't prepared.

THE COURT: Mr. Hernandez, you can come back up here.

MS. DOUENAT: Then say you don't know, but don't lie.

THE COURT: You are still under oath.

THE WITNESS: Yes. Yes, Your Honor.

(HECTOR HERNANDEZ, having been previously sworn, resumed the stand and testified as follows:)

DIRECT EXAMINATION

BY MS. DOUENAT:

Q. Agent Hernandez, you went back the next day to arrest the person in the Impala, correct?

A. Yes.

Q. And you ran the Impala?

A. We ran the Impala, yes.

Q. And it came back to a name, correct?

A. To a name, yes.

Q. When DPS stopped the vehicle, was it the same person that the car is named after?

A. I believe so, yes.

Q. Okay. And you mentioned that person had an order of removal, correct?

A. I don't remember that. Is that what I said?

Q. Yes. That is what you said.

A. I don't remember that case specifically off the top of my head, so...

Q. But you did say the reason why DPS stopped him is because you-all knew he had an order of removal because you looked him up through the --

A. I recall looking up. I recall an encounter, but I don't recall the specifics of it. And I believe DPS did a traffic stop based off of a traffic violation.

Q. Correct. But you did say on the stand earlier today that

the person had an order of removal.
A. I don't remember. If I said that, I would have to go through the transcript, but if I said that it was a mistake because I don't recall that case off the top of my head.
Q. Now that you're being called on it, it's a mistake, correct?
A. It's a mistake because I wasn't prepared for it to know the specifics of that case.
Q. I thought you knew what happened. You said you stopped the person the next day.
A. I didn't stop him. DPS did a traffic stop.
Q. You were part of the operation, correct?
A. I was part of the roadside where we respond.
Q. Were you the team lead?
A. I don't recall that day if I was a team lead or not.
MS. DOUENAT: Your Honor, I pass the witness.
THE COURT: Anything else?
MS. WANNARKA: No, Your Honor.
THE COURT: You may step down.
Okay. Let me hear arguments from the lawyers on all this.
Let's assume, just for argument's sake, that Officer Hernandez did all the activities that he did in double-checking to see the status of this individual. I guess the question for the defendant is: Why isn't that reasonable

suspicion that this defendant was here illegally?

MS. DOUENAT: First of all, I don't believe there's enough, and he, himself, did say that wasn't enough. I mean, he said he didn't -- I mean, he wasn't sure. You're never -- there's nothing on the record, you're not sure.

So you even asked him why he found out about his status until after he was arrested, and that's when he found out that he wasn't here legally. He goes, yeah, that's when I found out. He even admits himself when he found out was after that. Before but that, he didn't know. He wasn't sure.

Agent Carl basically talks about how ERO usually has the Fugitive Task Force, they deal with fugitives, right? They deal with people with final orders of removal. Hence, that's why he believed there was a final order of removal here. He worked with ERO before and that's the case.

Here, we have somebody who tells him this is an "easy target." He goes out of his way to do this easy target, which ends up not being that easy because he's trying to pull him out of the car instead of asking him questions about his status, and instead of talking to him in a calm fashion claiming that officer safety is at issue because he is on video chat with somebody --

THE COURT: Yeah. We'll get to those points later. So let's tackle the questions I have though.

MS. DOUENAT: Okay.

THE COURT: So for the government, though. Now, okay so this is a *Terry* stop in essence, correct?

MS. WANNARKA: Yes, Your Honor.

THE COURT: And so for a *Terry* stop you have to have reasonable suspicion supported by specific and articulable facts. In this case, that this is an individual here without authorization to be in the United States, and reasonable suspicion requires more than an un-particularized hunch. It's got to be based on specific and articulable facts, and you combine that with the rational inferences drawn from those facts that reasonably warrant the stop.

So where does the evidence here so far get you?

MS. WANNARKA: Your Honor, to begin, the HSI tip is made from someone who personally knows of the defendant. Let's say, arguably --

THE COURT: You don't know that. Let's stop there. All we have is the evidence is this lady lives in Alpine. This relationship that's going on with her daughter is taking place in San Antonio.

MS. WANNARKA: Yes.

THE COURT: There's nothing to suggest in the evidence before us that she has any personal knowledge of any of this.

MS. WANNARKA: Through her daughter she does.

THE COURT: That's not personal knowledge. That's

hearsay.

MS. WANNARKA: Well, let's say that they don't -- okay. So she doesn't know him, but she provides his name, his date of birth, and where he lives, and says he's not legally present. And so then HSI agents in Alpine do searches. They don't see that he's legally here. They think he's illegal in this country. And so we're going to refer this to San Antonio.

San Antonio gets the lead. Does the same research in different databases for his name and date of birth. He is not legally present in the United States. The agent, Officer Hernandez, even calls the female to confirm, did you make this statement, does he still live there. Yes, he does, and now he has a white truck. The truck he's arrested in.

And so then Officer Hernandez and DPS do surveillance. They confirm there are vehicles at the reported residence that are registered to this defendant. They confirm all of this and they also have a picture of his foreign-born ID saying he was born in Honduras, coupled with nothing, no status in the United States.

Officer Hernandez sees him, identifies him. And that is the probable cause that allows them to stop. And I will say that the Supreme Court, in *Brignoni-Ponce*, is an immigration vehicle stop case. And the Supreme Court said that with probable cause you can make a stop -- with

reasonable suspicion you can make a stop to investigate somebody's status, probable cause then to continue the stop.

THE COURT: Okay. Let's talk about the continuation.

So let's assume, for argument's sake, I'm going to credit Officer Hernandez, notwithstanding all the previous errors and misrepresentations done by HSI in this case, I'm going to credit his testimony here that he did all this. So they had reasonable suspicion to stop the vehicle.

Now, the reasonable suspicion to stop a vehicle under *Terry*, once you make that *Terry* stop, you are supposed to ask questions to satisfy yourself of that violation. And so in this case, they don't do that. They don't ask him anything about here, are you illegally. All that takes place well after the arrest and well after he's already placed in handcuffs.

MS. WANNARKA: Your Honor --

THE COURT: Isn't that a problem for you-all?

MS. WANNARKA: Well, right after -- right after Officer Hernandez gets to the driver's side window, the defendant is noncompliant. Noncompliant. Noncompliant. On his phone. But then he says, "Jaime, show me your ID," and Jaime shows him the ID of an Honduran ID with his name on it, same name, same date of birth, same country of citizenship. That confirms for Officer Hernandez they have the right guy.

THE COURT: Okay. So then let's stop there. At that

point isn't it incumbent upon him to seek a judicial warrant for the entry into the vehicle?

MS. WANNARKA: I don't believe so at this point.

THE COURT: Why?

MS. WANNARKA: Because Title 8 gives him authority to make an arrest when it isn't feasible to get the warrant.

THE COURT: Help me understand. How is it that they have to get a judicial warrant to go into a house, but all of a sudden you-all have created an exception for a vehicle?

MS. WANNARKA: It's a vehicle exception. They are on the side of the road --

THE COURT: If there's a vehicle exception, there's got to be exigent circumstances. I am making a ruling now that I found incredible the testimony of officer safety. That is just completely unfounded and not within the evidence in the record. And so what do you have there that allows for the entry into the vehicle without a judicial warrant?

MS. WANNARKA: Your Honor, they know he is illegally present. He's in violation of the law.

THE COURT: That's not enough.

MS. WANNARKA: And he's at the wheel of a large vehicle that isn't turned off. It is still on. And he can jet out of there as soon as he wants to, which we saw that he did.

*(Crosstalk)*

MS. WANNARKA: He can drive away.
THE COURT: With a trailer that he's pushing. That thing was huge.
MS. WANNARKA: But he operated the vehicle on the video. We saw him --
THE COURT: So what else you got, because that's not working for me.
MS. WANNARKA: Well, Your Honor, that is what gave the -- that is -- he showed us why the vehicle stop exists, because they can flee in the vehicle. He is --
THE COURT: So in this case the position of other vehicles prevented that. So again, how is it that you do not go to a judicial officer for a warrant?
MS. WANNARKA: Your Honor, I don't think that's -- I don't think they are required to get a warrant on the side of a road at a traffic stop to investigate a crime when he is resisting them. He won't get out of the vehicle. I don't think stopping and getting a warrant is practical or even required.
THE COURT: And so then now you've all created a vehicle exception to the normal warrant requirement. And so are you going to extend these arguments so far as to now houses? When they evade arrest and run into a house you don't have to get a warrant for a house anymore, is that the government's position now?

MS. WANNARKA: That is not my position. It is the specific circumstances of him being in a vehicle, that he did not turn off, that is on, and it prevents -- it does prevent a public safety threat. They can't just hold that with him being --

THE COURT: Why not?

MS. WANNARKA: He is not --

THE COURT: Why can't they keep the cars in front of the vehicle and behind the vehicle and just wait for the judicial warrant? What precludes that?

MS. WANNARKA: Your Honor, it is significant that he is on the phone. It is very significant --

THE COURT: We do not know who he's on the phone with.

MS. WANNARKA: Well, that's the point. They don't know. They don't know who he's calling.

THE COURT: That is all a hunch, that, oh, my goodness, he's using a cell phone, this must be a dangerous situation?

MS. WANNARKA: Well, for law enforcement who wants to go home at the end of the day, it's a very real threat.

THE COURT: This is 7:00 in the morning.

MS. WANNARKA: Well, they still want to go home at the end of that day. And they don't know who he is calling. They don't know what the neighborhood is.

THE COURT: So now anytime anybody is using a phone, you are going to argue now that that was a threat to officer safety?

MS. WANNARKA: Coupled with his noncompliance, yes.

THE COURT: I am deeply offended that you-all don't stop and get a search warrant. That's what the Fourth Amendment requires. And it wasn't even any, we're going to get a warrant, we're going to -- nothing. It's immediately go into -- we have within minutes of all this it escalates to the point that the window is broken. It all happens within minutes.

MS. WANNARKA: Yes, Your Honor.

THE COURT: What else do you got to defend yourselves?

MS. WANNARKA: That is it, Your Honor. The testimony and the videos today.

THE COURT: Okay. Last arguments from both sides.

Anything else from the defendant?

MS. DOUENAT: No, Your Honor, just the fact that, I mean, Officer Carl even lunges towards the vehicle that's moving, breaks the window, and then runs to his car to move his vehicle to bring it in the middle so if the vehicle does back up he can't go anywhere.

I mean, it's not like he was upset because he hurt his arm and he was concerned about officer safety. I mean,

they were doing all of this so that he would stop. I mean, to me, it's like they don't inform him why they needed to stop the vehicle and get out of the car. They don't tell him anything. They don't ask him who he's on the phone with. They could have asked him, "Who are you on the phone with?" "Put down your phone. Stop calling."

They didn't do any of that. It's just automatically, get out of the car, get out of the car. Individuals who have unmarked vehicles, who are more than one, several, and one is on one side of the door, one is on the other side of the door, and when they do ask him for his license, he complies because this seems normal.

But everything else does not seem normal. And it's happening very fast, very escalated, very quickly. And, yes, they should have gotten a warrant, Your Honor. We don't feel like no database information is not sufficient reasonable suspicion or probable cause for that matter. And -- yeah.

THE COURT: So now the hard questions for you-all.

I mean, you are asking me to suppress, and so the only thing to suppress is the oral statements that he made, but how is that going to get him out of this charge?

MS. DOUENAT: I'm actually asking for a motion to dismiss based on the fact that, you know, the officer caused his own injury. He specifically said he knew the vehicle was moving and then he ended up going and lunging and that's why

he got cut. So why did he have to break the window when the vehicle was moving?

THE COURT: But isn't that a jury issue, rather than for the bench to decide?

MS. DOUENAT: No, actually, it's not, because those are uncontested facts. That is what he did, his actions, his physical actions himself, not the client's actions that caused his injury. He caused his own injury because he saw the moving vehicle go forward and he chose to at that time break the window, knowing it was going forward and there was a high risk and probability he would get hurt.

THE COURT: And then so last --

MS. DOUENAT: And that's like the Sixth Circuit case, Your Honor, where the individual gets hit by the defendant and then he headbutts him and he's got a cut on his eye. And it's because he headbutted him, his actions, the officer's actions, his intent, were the officer's intent that caused that injury, not the client's.

THE COURT: And so the government here then. What am I to make of this statement that apparently there is word on high that you do not get judicial warrants and you just break glasses and open doors?

MS. DOUENAT: That's a problem for me.

THE COURT: That's a problem for everybody. It's a problem for the Constitution. It's a problem for the public.

It's a problem for the way that the judicial system should be working.

MS. DOUENAT: Yes.

THE COURT: And so how does the government want to respond to that?

MS. WANNARKA: Your Honor, the government believes that the agents had probable cause to stop the defendant and to further investigate whether or not he was illegally present in the United States.

He forcibly resisted the entire time. The government does believe it caused an officer safety risk. But at the end of the day, an agent was injured, and 111 was created to prevent the interference of legitimate government activity and to keep officers from being injured. In this case, one was because of the defendant's actions. Solely because of his actions of resisting, evading, impeding, and interfering with an agent was injured.

THE COURT: But the legitimate government activity is highly in question when you have an oral directive from higher-ups that we shall disregard the Fourth Amendment and not seek warrants.

MS. WANNARKA: Your Honor, in this case the government does not believe a warrant was needed.

THE COURT: This is a troubling case and the testimony I heard from the witnesses only made it more

troubling. At the same token, I'm trying to be cognizant of my role versus any jury consideration role in all this. I'm going to take this under advisement and not make a heated decision.

Anything else from either side?

MS. WANNARKA: Not from the government, Your Honor. Thank you.

MS. DOUENAT: Not at this time, Your Honor. Thank you.

THE COURT: We're adjourned.

*(Concludes proceedings)*

-o0o-

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Date: 08/27/25

/s/ Gigi Simcox
United States Court Reporter
262 West Nueva Street
San Antonio TX 78207
Telephone: (210)244-5037